In the Matter of Frederick J. CHASE,
Appellant.

No. 18914.

United States Court of Appeals,
Seventh Circuit.

Argued May 15, 1972.

Decided Sept. 25, 1972.

Rehearing En Banc Denied
Oct. 24, 1972.

---

William C. Cunningham, Center for Constitutional Rights, New York City, for appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., Chicago, Ill., for appellee.

Before CUMMINGS, PELL and STEVENS, Circuit Judges.

CUMMINGS, Circuit Judge.

In June 1969, appellant Frederick Chase and ten others were indicted for destroying government property, mutilating government records, interfering with the working of the Selective Service Act by force and violence, and conspiracy to commit those three offenses. After a lengthy jury trial, Chase was found guilty on all four counts. He was sentenced to five years' imprisonment on Counts III and IV, to run concurrently; as to the remaining two counts, he was placed on probation for five years com-

mencing with the expiration of the other sentences.

When the trial of the eleven defendants commenced on May 6, 1970, Chase refused to stand when the trial judge entered the courtroom, and he continued to do so whenever the judge or the jury entered or left the courtroom during the trial.

At the opening of the afternoon session on May 8, Chase's counsel read into the record a note from Chase explaining his refusal to rise. This note reads as follows:

"The Bill of Rights provides for freedom of religion. While my religious beliefs may not be conventional in terms of religion, I still feel that they have to be followed in order to follow the dictates of my conscience. The First Commandment states, 'I am the Lord, thy God. Thou shall not have false gods before me.'

"My religious belief, if the Judge or anyone cares to call it that, defines God as collection of living things. While I can participate in actions of respect toward human beings, I cannot participate in actions of respect toward institutions which would indicate a superiority of the institutions over human beings. In conventional religious terms I cannot place false gods before the true God. By requiring that I stand, Mr. Robson is violating my right to religious freedom and also requiring that I violate my conscience. I would appreciate it if you would attempt to explain this as soon as possible."

Chase then told the court:

"I have no qualms about standing for you as a man; I respect you as a human being. It is just that I can't stand for institutions.

"I feel the same way for the jury. I intend no disrespect for them as human beings, but I can exercise no respect for them as jurors, because I do feel that that violates my conscience. If you are—if you could just say to

me that you understand that I would be standing to you as a human being, and not as a judge, I would be willing to do so."

In response, the judge stated:

"Now I am not asking that you stand for me; I am asking that you stand for the courts which are a part of our whole system of government within this country.

"I took a solemn oath when I was sworn in as a judge to uphold all of those standards, including those of the Constitution, and I do not intend to allow one individual or individuals to attempt to break that down.

"Now when you stand, you will be standing to the courts of this country, not for me. I am just a human being, as you are, but I am dealing with institutions.

"Unless you agree to stand, you offer me no alternative but to hold you in contempt of court.

"I have a list of all of the times.

"Now if you will agree to stand, not to me as an individual, but as to the courts, then we will have no problems.

"But if you refuse, you give me no alternative but to exercise the powers that are given to me for carrying out my responsibility as a Judge of the United States District Court."

Thereafter, the following colloquy occurred between the court and Chase:

"THE COURT: Now I ask you now whether or not you will stand not when I come in as an individual, but for me as a representative of the court system, and for the jury as a representative of the court system?

"If you will promise me that you will, we will have no further problems.

"If you refuse to do so, then you will give me no alternative.

"I ask you what your attitude is.

"DEFENDANT CHASE: Well, sir, I am attempting to follow the dictates of my conscience, and I feel that those dictates have priority over the dictates of the State. And I am afraid that I have to say that I can't stand.

"THE COURT: All right now let me state this to you, Mr. Chase, that it is not just for this one offense, it will be a continuing one. Every time you fail and refuse to stand, then I will have no other alternative but to hold you in civil contempt."

Subsequently Chase advised the court that he did not belong to any formal religion but was "from a catholic background." He said that since the community of man was his god, he could not place anything above his respect for human life and therefore could stand for the trial judge only as a man rather than as a judge.

The court then announced that it would not impose any contempt sentence for May 6 or 7, but that since Chase had already been warned on May 7, it was imposing a 20-day civil contempt sentence for the eight refusals to stand when the court and jury came in on May 8. The judge explained that Chase would not have to commence serving the 20-day sentence until the end of the trial.[1] He then stated,

"Now, if you continue to flaunt your responsibility as a citizen of this country, I am going to continue to impose contempt citations, and I ask you to think of that.

"If you tomorrow morning, or Monday morning, when Court opens, will come in and promise to observe the proceedings in this Court, I will consider that in connection with it.

"I will give you that opportunity to think of it. You may purge yourself of contempt, or the Court has no other alternative than to impose sentences. Do you understand that?

"DEFENDANT CHASE: Yes, sir."

At the close of the proceedings on May 15, Chase again explained his attitude, stating:

"I think I have made my position fairly clear on the reason why I do

---

1. This sentence is not involved in this appeal.

not feel I can rise. I understand that you are trying to uphold the law, as you understand it. I am trying to uphold the right as I understand it. I have discovered that the two often come in conflict, but as long as I have the strength, I will have to stand by the right rather than the law."

During the course of the trial and at its conclusion, a total of five certifications of criminal contempt for persistence in 'refusing to stand on the entrance of the court or jury were read to Chase pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure.[2] The first certification was rendered on May 11 and was accompanied by the following prefatory remarks:

"Pursuant to Rule 42(a), Federal Rules of Criminal Procedure, the court finds that the defendant Frederick Joseph Chase has committed certain contemptuous acts in the actual presence of the court. The defendant Chase has refused to rise for either the court or the jury at 'the opening and adjournment of each and every session of the court.

"The record reflects that the court has brought this matter to the defendant Chase's attention on several occasions, and warned him that continuation of such conduct would be punished as criminal contempt. At the opening of court on Friday afternoon, May 8, 1970, the court admonished the defendant Chase that his misconduct was a manifestation of contempt not for the court personally but rather indicated his contempt for the judicial process and the courts of the United States. The court then advised the defendant Chase that he would be giv-

en the opportunity to reconsider his conduct and purge himself of any and all previous acts of contempt. Following the court's admonition, however, the defendant Chase has refused to rise on each and every occasion when so directed by the court through the Deputy United States Marshal. The court therefore adjudges the defendant Chase to be in direct, criminal contempt of this court and imposes the following sentences: "

In the first certification of contempt, 3-day consecutive sentences were imposed for seven refusals to rise when the court or jury entered the courtroom on the afternoon of May 8 and again on May 11. The second certification of contempt occurred on May 15 and covered eleven similar refusals to rise, again resulting in 3-day sentences consecutive to those imposed on May 11. The third certification, handed down on May 19, covered 15 later identical contempts, resulting in a 45-day consecutive sentence; the fourth certification, rendered May 21, covered 13 later contempts resulting in a 39-day consecutive sentence; and the final certification, given at the close of the trial on June 9, covered 53 similar refusals to rise, again resulting in 3-day consecutive sentences for each. Together the five certifications covered 99 identical acts of contempt,[3] resulting in a total sentence of 297 days to be served prior to the 5-year prison term imposed upon conviction of the offenses for which he was indicted.

Chase first contends that the certifications of criminal contempt must be vacated because his refusals to rise do not constitute misbehavior obstructing the

2. Rule 42(a) provides:
  "Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record."

3. According to Chase's brief, there were 89 refusals to rise in the presence of the jury and 35 outside the presence of the jury, so that the trial judge did not cite him for contempt for every instance of refusal that came to the court's attention.

administration of justice within the meaning of the contempt statute.[4] We ruled to the contrary in United States ex rel. Robson v. Malone, 412 F.2d 848, 850, stating that the rising "requirement is sufficiently related to maintaining order in the actual presence of the court, so that an infraction can be dealt with summarily under Rule 42(a) * * *."[5] As we pointed out, "the traditional rising in unison of persons present in a court can reasonably be thought to contribute to the functioning of the court. It is a way of marking the beginning and end of the session, and probably serves to remind all that attention must be concentrated upon the business before the court, the judge's control of the court room must be maintained with as little burden on him as possible, and there must be silence, except as the orderly conduct of business calls for speech." In United States v. Seale, 461 F.2d 345, 369 (7th Cir. 1972), we ruled that the contempt statute contemplates an actual, material obstruction. Contemporaneously in In the Matter of Dellinger, 461 F.2d 389, 401 (7th Cir. 1972), we reaffirmed the *Malone* conclusion, as applied to defendants in a criminal trial,[6] that the judge "may require such rising" at the beginning of a session and end of a recess, and we did so fully cognizant, though unconvinced, by the type of approach espoused wholesale by the dissent. *Id.* and n. 10. Failure to rise could well constitute an actual and material obstruction to judicial administration although a mere refusal to rise does "not necessarily alone amount to obstructions punishable as criminal contempt." *Id.*

■ Because of Chase's behavior throughout the trial, various colloquies ensued between the judge, Chase and his counsel. On each of the occasions involved here the district judge would ask the deputy marshal to see that Chase stood up or to assist him to his feet. The judge would then note the refusals to rise on the record. At four intervals during the trial, he read four of the resulting citations of contempt to Chase. The fifth was read at the end of the trial. We consider that these various episodes necessitated interrupting the trial proceedings sufficiently to amount to obstructions of judicial administration within the meaning of the criminal contempt statute. See Comstock v.

---

4. 18 U.S.C.A. § 401 provides in pertinent part:
   "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
   (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice."

5. The *power* of a trial judge to require the rising of persons in a courtroom at the beginning of a session or end of a recess is not established only if such rising is necessarily required by the orderly functioning of judicial proceedings or if a material obstruction of those proceedings would exist without the rising. Rather, the judge may require such rising because it is "sufficiently related to maintaining order in the actual presence of the court." If either of the former standards were alone applicable, there would be very little a trial judge could do in his role as governor of the trial which he could enforce with the contempt power.

6. In Comstock v. United States, 419 F.2d 1128, 1131 (9th Cir. 1969), Judge Merrill cited only *Malone* in upholding the contempt conviction of a criminal defendant for refusing to rise, evidently finding unpersuasive any distinction between a defendant and other persons in a courtroom with reference to the validity of a rising requirement.
   The functional justification for the judge's entitlement to require rising does not change because the person addressed is a defendant, and the mechanical act of rising, unlike, perhaps, the flag salute, is not something completely devoid of functional significance and solely designed to signify a certain set of beliefs. Thus the fact that a criminal defendant is not voluntarily in court does not assume the dispositive importance the dissent gives it.

United States, 419 F.2d 1128, 1131 (9th Cir. 1969).[7]

The Government asks us to hold that every failure to rise amounts to a sufficient obstruction of judicial administration on the basis that "the violation of a rule related to the orderly administration of justice creates *per se* obstruction." Otherwise, the Government argues, "the determination of the offense would not rest on the wrongful character of the conduct, but upon the resulting reaction of the judge." Had we accepted the Government's argument in *Dellinger, supra*, we certainly would not have stated that a mere refusal to rise, without more, does not necessarily obstruct the administration of justice. 461 F.2d at 401. A participant's or spectator's defiance in the face of the court's insistence on his rising can supply the requisite obstruction because the judge properly "may require such rising."[8] But even without any reaction by the judge, the failure to rise may amount to an actual and material obstruction if, for instance, as is quite likely, it distracts others in the courtroom or provokes a reaction on their part or is accompanied by a failure to become silent or focus attention on the business before the court. Pursuing the Government's argument to its logical absurdity, if a person in the last row of seats, not noticed by spectators seated farther forward or participants, simply refuses to stand on the bailiff's request but is intent on the proceedings about to start, and he is merely noticed but not then even addressed by the judge, we would have to find an obstruction of judicial administration. We are loath to adopt a rationale with this result. The contempt statute requires something more tangible, though not always physical, in the way of an obstruction. See Judge Kaufman's cogent analysis in United States v. Meyer, Slip Op. at 9–10 (D.C.D.C.Crim.Case No. 872–69, Misc. No. 28–72, decided July 28, 1972). However, we do note the long-standing tradition of rising out of respect for the court as well as its functional justification; thus refusal to abide by it may be viewed as not insignificant misbehavior. And as we stated in *Seale*, "the seriousness of the misbehavior bears on what conduct may be found materially obstructive." 461 F.2d at 369. Suffice it to say again, the refusals to rise in direct defiance of the judge's orders here could properly be found materially obstructive. United States v. Seale, *supra* at 371. We have no occasion to determine whether a sufficient obstruction could have been found absent the judge's insistence that the appellant comply with the rising requirement.

7. True, in *Comstock* the defendant also "went limp" when the marshal took him to the bench and "lay prostrate on the floor" when the judge addressed him following his refusal to rise. See dissent *infra* n. 9. But the contempt citation was affirmed with *Malone* as the single supporting citation, and the Ninth Circuit necessarily had to recognize the district court's power to require defendant to rise in the first place. Surely no one would argue that defiance of the court's direction must be as dramatic as it was in *Comstock* to be materially obstructive! It may be reiterated that here the judge's attempts to have Chase rise sometimes necessitated the deputy marshal

8. A judge is not obligated, for instance, to tell counsel to stop asking redundant questions. The repetitive questioning itself might not materially obstruct the judicial proceedings, but the judge, who is governor of the trial, may require counsel to desist in order to facilitate orderly and expeditious progress of the trial. If the attorney defiantly refuses to desist, are we to say that the attendant interruption cannot amount to an obstruction simply because the trial judge might have chosen to ignore the superfluous interrogation? Naturally not. So long as the trial judge is entitled to demand a course of conduct, as we have held he is entitled to with respect to the rising of persons in a courtroom—spectators and defendants alike—a material obstruction may inhere in the recalcitrance of the person directed. Although it may at times be the wisest course, a trial judge need not remain indifferent to a refusal to rise by anyone in the courtroom. We reject any suggestion which tends to reduce a trial judge's role to that of a mere passive observer in the face of such conduct.

■■ Chase also argues that his refusals to rise were protected by his religious belief. According to that belief, appellant maintains he could not stand for the judge or jury as institutions, and the judge's insistence that he rise for the institutionalized courts violated his freedom of religious exercise guaranteed by the First Amendment. Although the trial judge's apparent insistence that appellant's rising would signify respect to institutions was perhaps unnecessary since, as a practical matter, allowing appellant to stand for his own reasons may have alleviated the problem, we cannot take appellant's argument seriously. This is because he has consistently admitted his willingness to rise for reasons of his own. His conscience, he said, would not have been offended by rising for the judge and jury as human beings. Moreover, he has never claimed that his religious belief required him initially to inform the court of the only signification he could give his standing, nor has he ever claimed that belief necessitated his forcing the judge to acknowledge the meaning of his rising. In the absence of any scruple at rising *per se* or any claim that his conscience required him to externalize his beliefs and secure the court's acquiescence, no legitimate First Amendment question is presented. In any event, we would reiterate our holding in *Malone, supra,* 412 F.2d at 850, that the First Amendment does not excuse performance of the rising requirement. See also Stein v. Oshinsky, 348 F.2d 999, 1001 (2d Cir. 1965); Evans v. Ciccone, 377 F.2d 4, 6 (8th Cir. 1967).

■ Chase next asserts that under Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522, and its progeny, he was entitled to a jury trial of these contempts in that a total sentence of 9 months and 27 days was imposed, whereas summary adjudications of contempts are only permissible where the penalty

imposed does not exceed 6 months' imprisonment. This argument would be persuasive if the trial judge had waited until the conclusion of the court proceedings to cite Chase for all his foregoing contemptuous conduct. In United States v. Seale, 461 F.2d 345, 352–356 (7th Cir. 1972), we held that where the trial judge does not cite for contemptuous conduct immediately upon its occurrence but waits to act until the conclusion of the proceedings, consecutively imposed sentences for that conduct must be cumulated to determine the contemnor's right to a jury trial. Here the trial judge did not cite appellant immediately upon his refusal to rise. However, rather than waiting until the end of the trial to find him in contempt for all his previous failures to rise, in which case an aggregate sentence of 9 months and 27 days would require the impanelling of a jury, the trial judge adjudicated appellant in contempt and pronounced sentence periodically four times during the trial and once at its end. All the theory of the aggregation rule announced in *Seale* requires is that the consecutive sentences imposed on each of the five certifications of contempt be cumulated to determine the necessity for impanelling a jury with respect to any of the five findings of contempt. Since none of the five citations carried an aggregate sentence greater than 6 months' imprisonment,[9] no jury was required to determine appellant's guilt for the conduct charged in any of them.

The aggregation rule announced in *Seale* is partly justified as a protection against circumvention of the right to jury trial through a belated, arbitrary singling out of discrete instances of contempt from preceding disruptive conduct. The rule affords fuller protection than the necessarily imprecise appellate review of the trial judge's discreteness determination. United States v. Seale, *supra,* 461 F.2d at 353–354. Neverthe-

9. The longest cumulative sentence was that imposed on the fifth adjudication of contempt—5 months and nine days.

less, especially where as here the cited conduct consists of a repetition of a single contemptuous act, immediate citation and punishment not in excess of 6 months upon each instance or periodic citation with a 6-month or less total punishment each time may still improperly deny the contemnor a jury trial if it oppressively converts a single continuing offense into a series of individual ones. But contrary to the situation where a witness refuses to answer a spate of similar questions on Fifth Amendment grounds, where transparent proliferation of contempts is often found, here there was no opportunity for "prosecutors, by their sheer ingenuity in conceiving and stamina in asking multiple questions calling for slightly different answers, * * * to proliferate offenses." Baker v. Eisenstadt, 456 F.2d 382, 390 (1st Cir. 1972);[10] see Yates v. United States, 355 U.S. 66, 73, 78 S.Ct. 128, 2 L.Ed. 2d 95. Rather, the long-standing rule of court procedure that the persons in the courtroom rise upon the entrance of judge and jury was not contrived nor could here have been manipulated to multiple the offense of refusal to rise.[11] Even if we could properly compare appellant's refusals to rise to a witness' refusals to answer successive, similar questions on Fifth Amendment grounds, this record does not show that Chase would assuredly continue to adhere to his initial refusal to stand, especially since he admitted to being able conscientiously to stand for his own reasons and

never claimed his religious belief required more than the proper interior disposition. See Yates v. United States, *supra* 355 U.S. at 73–74, 78 S.Ct. 128; Baker v. Eisenstadt, *supra* 456 F.2d at 393.[12]

Finally, there is nothing ineluctable about whether Chase's refusals be viewed as a single offense or separate infractions, but the contemnor's merely positing a common reason for his refusals is not alone enough to make his offense singular. Viewing them separately is rather natural, and we will not upset the trial court's so seeing them.

■ Since the judge's initial imposition of a 20-day sentence for civil contempt had been unsuccessful, it was permissible for him to resort to the criminal contempt route. See Illinois v. Allen, 397 U.S. 337, 344–345, 90 S.Ct. 1057, 25 L.Ed.2d 353; Yates v. United States, *supra* 355 U.S. at 74–75, 78 S.Ct. 128. Chase urges though that it was improper for the court to employ the summary disposition procedure of Rule 42 (a) of the Federal Rules of Criminal Procedure.[13] That rule authorizes summary action if, as here, the judge saw the conduct constituting the contempt and if it was committed in the actual presence of the court. Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L. Ed.2d 240, is of no avail to appellant, for there the real contempt occurred before the grand jury, and the majority

---

10. In Baker v. Eisenstadt, Baker had been sentenced to 5 months' imprisonment for 12 refusal to answer questions at a hearing involving charges of judicial misconduct. He was later sentenced to an additional 24 months for refusing to answer other questions put at the same hearing. The court held that under the circumstances there was an initial total refusal to answer all questions related to the object of the inquiry, so that only a single contempt had been committed. Instead of remanding for jury trial, the court of appeals directed the writ of habeas corpus to issue if the aggregate state sentence summarily im-

posed on petitioner were not revised so that it would not exceed five months. 456 F.2d at 395.

11. A different situation would exist if the judge repeatedly walked in and out of the courtroom in order to multiply the occasions on which a recalcitrant person would be required to rise.

12. Moreover, in refusal to answer situations, answering one question may operate to waive the privilege for the remaining interrogation. Baker v. Eisenstadt, *supra* 456 F.2d at 393–394. Here no waiver doctrine is involved.

13. See note 2, *supra*.

opinion viewed the bringing of the witness into court and the repetition of the questions before the judge as fashioned "to have the refusal to testify 'committed in the actual presence of the court' for purposes of Rule 42(a)." *Id.* at 164, 86 S.Ct. at 354. The present case is not one wherein Rule 42(a) proceedings are inappropriate because the contemptuous conduct involved an insolent, personal attack on the trial judge which disqualified him from adjudicating the contempt post-trial. Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532; United States v. Seale, *supra* 461 F.2d at 351–352; In the Matter of Dellinger, *supra* 461 F.2d at 392–395. The appellant's conduct did not require the trial judge to recuse himself from pronouncing the contempt judgment. See Ungar v. Sarafite, 376 U.S. 575, 583–588, 84 S.Ct. 841, 11 L.Ed.2d 921. Although some question arises as to whether the trial judge may in every case not involving embroilment or personal attack proceed summarily to convict for contempt after the termination of the trial (see Groppi v. Leslie, 404 U.S. 496, 506, 92 S.Ct. 582, 30 L.Ed.2d 632; Ungar v. Sarafite, *supra* 376 U.S. at 589, 84 S.Ct. 841; United States v. Meyer, 149 U.S.App.D.C. 212, 462 F.2d 827, 843 and n. 25 (1972)), here the trial judge was well within his rights in proceeding under Rule 42(a) to punish these contempts. First of all, this is not a case where the judge acted only at the close of the proceedings; four times during the course of the trial summary proceedings were had as well as at its end. Moreover, the judge explicitly warned Chase at the outset that his refusals to rise were regarded as contumacious and that he would be later called to account. Importantly, the judge engaged in lengthy colloquy with the contemnor, allowing him fully to explain the purpose and motive of his refusals; each time a contempt judgment was pro-

nounced, the judge took pains to give appellant an opportunity to speak in his behalf.[14] The appellant was accorded due process. Cf. Groppi v. Leslie, *supra* 404 U.S. at 506, 92 S.Ct. 582.

■ Finally, Chase asks us to shorten the 10-month sentence imposed. In *Malone, supra,* we reduced the ten and thirty day sentences of confinement to the few hours the contemnors were held in custody before being released on bond by this Court. In our judgment, because this case involved at least 99 refusals to rise and a stubborn disregard of reiterated judicial commands, a total sentence of 30 days for Chase's misbehaviors was justified but, under the circumstances, not more. Consequently, the 5-year imprisonment must be deemed to have commenced running immediately after the first 30 days served for these contempts.

Apart from the reduction in the contempt sentences to a total of 30 days, the judgments of conviction under 18 U.S.C. § 401(1) are affirmed.

STEVENS, Circuit Judge (dissenting).

In my opinion, the district court sought to exercise a contempt power which Congress has withdrawn from the judiciary if, indeed, it ever existed.

I think the district court correctly described the real reason why courts generally command or request those present to stand when a session commences or concludes. Rising is a traditional demonstration of respect "for the courts which are a part of our whole system of government within this country." I share the district judge's respect for that tradition; like so many facets of our manners, it serves a valid purpose in linking our past to our future. But if we recognize that tradition for what it

---

14. At the last judgment, it was Chase's counsel who was accorded the oppor-tunity to say whatever he wished in behalf of his client.

is, we must also acknowledge that the sovereign's power to require its free citizens to perform symbolic acts of respect for authority is not unlimited.[1]

This case does not raise the question whether any "rising requirement" at all is justified. For purposes of analysis, I assume that the requirement as applied to spectators, counsel, and court personnel is valid—either because the ceremonial act serves the function of marking the beginning and ending of sessions and focusing attention on what is about to transpire[2] or, more logically in my view, because the tradition emphasizes the solemnity and majesty of the judicial process and thus increases the probability that witnesses will speak the truth and advocacy will be rational and not just emotional. The issue here is not whether these considerations adequately support a general command to rise; the issue is whether the defendant in a criminal trial must heed such a command.

It does not follow, as the district court assumed, that if any individual were permitted to disobey the command to rise, a crack would form in the judicial edifice which would ultimately cause the entire structure to crumble.[3] The edifice rests on a stronger foundation than its ceremonies; the real respect of the citizenry for the judiciary is earned, not commanded. But even if individual exceptions to the general rising requirement were normally unacceptable,[4] countervailing considerations of more fundamental importance must be considered when the command is directed at an individual on trial for his liberty.

Insofar as the rising custom serves the purpose of marking the beginning or the end of a session, or of reminding those present to be quiet and to pay attention, it matters not one whit whether the defendant also rises. He will certainly know that the proceedings are about to resume and, if ignored, his posture will not prevent that message from

1. It is also unaffected by a judge's evaluation of the desirability of the ritual. As the Supreme Court reminded us in the compulsory flag salute case:

   "Whether the First Amendment to the Constitution will permit officials to order observance of ritual of this nature does not depend upon whether as a voluntary exercise we would think it to be good, bad or merely innocuous." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 634, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628.

2. See United States ex rel. Robson v. Malone, 412 F.2d 848, 850 (7th Cir. 1969).

3. The district judge stated:

   "If we allow one little crack to come within that edifice, ultimately it can topple, and as far as I am concerned, I am going to do everything I can to protect that for the benefit and the protection of all of the people of this great country of ours, . . . ." Tr. 486.

   Consider, however, the contrary expression by the Supreme Court, albeit in a different context:

   "Nevertheless, we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization. To believe that patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine is to make an unflattering estimate of the appeal of our institutions to free minds. We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 641-642, 63 S.Ct. 1178, 1187.

4. The judicial process routinely copes with individual deviations from normal practice. At arraignment, the mute defendant is treated as though he had spoken; at trial, the witness who refuses to swear may affirm. Even with respect to the rising requirement, the court agrees that it would be a "logical absurdity" to force every spectator in the back row to stand. See majority opinion at page 133.

reaching those who are on their feet. The real question is whether his failure to perform the traditional symbolic gesture of respect for the court is such a distraction that the orderly conduct of the proceedings may be materially impaired. Unless the defendant's action—or as in this case, his inaction—constitutes a material "obstruction to the performance of judicial duty," it is not punishable as criminal contempt.[5] The question, then, is whether a defendant's refusal to rise constitutes such an obstruction.

Two undesirable consequences may flow from a defendant's apparent defiance of authority manifested by remaining seated while others stand: (1) the jury's attitude toward the defendant may be prejudiced, and (2) the judge's sensibilities may be offended. Neither of these consequences can be fairly characterized as a material "obstruction to the performance of official duty."

The prejudice to the accused is unfortunate, but it is of his own making. The probability—perhaps inevitability —of that consequence eliminates the need for further punishment as a deterrent to repetition.[6] Regardless of its impact on the minds of the jurors, a refusal to stand will not impair their ability to see or hear the proceedings. The *functioning* of the judicial process is not affected.

The impact on the sensibilities of the judge is somewhat different. He must do more than observe; he must preside effectively and be prepared to rule promptly and impartially on a variety of questions that arise as the trial progresses. An affront to the judge may indirectly affect the entire proceeding. Nevertheless, the Supreme Court has repeatedly cautioned judges to "be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." In re Little, 404 U.S. 553, 555, 92 S.Ct. 659, 660, 30 L.Ed.2d 708; Brown v. United States, 356 U.S. 148, 153, 78 S.Ct. 622, 2 L.Ed.2d 589; Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11.[7] The relevant inquiry is not whether "a technical contempt at common law" has occurred, but rather, since "a judge of

---

5. "An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest." Ex parte Hudgings, 249 U.S. 378, 383, 39 S.Ct. 337, 339, 63 L.Ed. 656.
   The obstruction must, of course, be "material." United States v. Seale, 461 F.2d 345, 369 (7th Cir. 1972).

6. Presumably, as was true in this case, counsel will advise the defendant of the reasons why his interests will be served by standing; the manifest wisdom of that advice makes it unlikely that the issue presented to us will arise very often.

7. As we stated in United States v. Seale, 461 F.2d 345, 369 n. 45 (7th Cir. 1972):
   "In Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11, . . . , the Supreme Court rejected the notion that protection of the judge's personal dignity was a permissible exercise of the contempt power. Four years later in Brown v. United States, 356 U.S. 148, 153, 78 S.Ct. 622, 2 L.Ed.2d 589, . . . , the Court cautioned trial judges 'against confusing offenses to their sensibilities with obstruction to the administration of justice.' See also In re Michael, [326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30]; Ex parte Hudgings, [249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656]; and In re McConnell, [370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434]. Astutely, Professor Dobbs observed in his article on contempt—Dobbs, [Contempt of Court: A Survey, 56 Corn. L.Rev. 183] at 208:
   "'Where nothing more than disrespect or discourtesy is involved, however, the dangers of abuse of contempt power may outweigh the benefits of using that power. The readiness of some judges to find contempt in perfectly respectful conduct, and readiness of others to induce it by behavior on the bench, suggest these dangers of abuse. Finally, it should be emphasized that mere personal insult or irritating conduct should not readily be accepted as contempt. The nature of the trial as an honest human effort to reach a just result must be

the United States is expected to be a man of ordinary firmness of character," whether it tended "to prevent his performing his sworn duty." [8] In this case the record plainly demonstrates that the effective and impartial performance of the trial judge's sworn duty was not impaired in the slightest. The contention that an obstruction to the administration of justice resulted rests on a wholly different predicate.

The "obstruction" consisted of nothing more than the colloquies which ensued when the court unsuccessfully sought to persuade the defendant to rise. But that obstruction was the consequence—as I view the issue—of the judge's erroneous interpretation of the law, rather than of the disrespectful conduct itself. As I read the applicable statute, and the opinions construing it, it is the misbehavior itself—rather than the judge's attempts to punish or prevent it—that must obstruct the proceedings.[9] Congress has provided:

> "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, *and none other,* as—
>
> "(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; . . . ." 18 U.S.C. § 401. (Emphasis added)

Even though federal judges once had broader contempt powers than now authorized by Congress, it is well settled that those powers may properly be, and have been, limited by statute. Ex parte Robinson, 86 U.S. 505, 510–511, 19 Wall. 505, 22 L.Ed. 205; Nye v. United States, 313 U.S. 33, 47–48, 53, 61 S.Ct. 810, 85 L.Ed. 1172. Those powers were first narrowed by Act of Congress in 1831, 4 Stat. 487, and again in 1948, 62 Stat. 701. Even prior to those statutory limitations, however, the contempt power had been described as, "perhaps, nearest akin to despotic power of any power existing under our form of government." State ex rel. Attorney General v. Circuit Court, 97 Wis. 1, 8, 72 N.W. 193, 194 (1897), and the Supreme Court, quoting from its early opinion in Anderson v. Dunn, 19 U.S. 204, 6 Wheat. 204, 5 L.Ed. 242 (1821), has "marked the limits of contempt authority in general as being 'the least possible power adequate to the end proposed.' *Id.* at 231. And see In re Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30." In re Oliver, 333 U.S. 257, 274, 68 S.Ct. 499, 508, 92 L.Ed. 682. Construing the statute in its present form, the Supreme Court stated that "Congress has limited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice." In re McConnell, 370 U.S. 230, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434. Unquestionably, judges must strictly construe their power to punish misbehavior which obstructs the administration of justice.

If this power is strictly construed, I have no doubt that a defendant in a criminal trial may refuse to participate in the rising ceremony. He is the only

---

preserved and enhanced, and no person by his conduct should create an atmosphere that makes this impossible. But personal discourtesy or insult is on an altogether more trivial plane, and a certain amount of that should be tolerated when it falls short of interfering with the nature of the trial.' "

8. "But a judge of the United States is expected to be a man of ordinary firmness of character, and I find it impossible to believe that such a judge could have found in anything that was printed even a tendency to prevent his perform-

ing his sworn duty. I am not considering whether there was a technical contempt at common law but whether what was done falls within the words of an act intended and admitted to limit the power of the courts." Toledo Newspaper Co. v. United States, 247 U.S. 402 at 424, 38 S.Ct. 560 at 565, 62 L.Ed. 1186 (Mr. Justice Holmes dissenting).

9. Unlike the contemptuous conduct reviewed in Illinois v. Allen, for example, there was no risk that the defendant's refusal to rise might destroy any "semblance of order in the court" or "make

person in the courtroom who is not present as a matter of choice. It is one thing to require those who have elected to participate in, or to observe, the judicial process to conform to its manners as a condition of attendance. It is quite another to compel an unwilling participant to perform a symbolic gesture of respect.[10] The court's unquestioned power to command him to be present and to prevent misbehavior which will impair the orderly conduct of the trial does not, in my opinion, encompass any power to make the defendant stand when court convenes or adjourns.

My appraisal of the issue is unaffected by the defendant's motivation for his singular conduct. If his misbehavior

was contemptuous within the meaning of the statute, I agree that it could not be excused by a religious or other conscientious motivation. Conversely, although I share the trial judge's appraisal of the reasons for "the rising requirement," he plainly exceeded his powers by insisting not merely that defendant must rise but also that he must do so with a particular state of mind.[11] Valid rules of conduct must be obeyed. But a citizen's respect is his to give or to withhold according to the dictates of his own conscience. Since the defendant was not present in court by choice, I do not believe he could legitimately be forced to profess a respect he did not feel.

---

a shambles of the criminal judicial process." See United States ex rel. Allen v. Illinois, 413 F.2d 232, 235 (7th Cir. 1969) (Circuit Judge Hastings dissenting), reversed, Allen v. Illinois, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353. Nor is this a case in which the defendant "went limp and as the court addressed him lay prostrate on the floor." Comstock v. United States, 419 F.2d 1128, 1131 (9th Cir. 1969).

10. The point may be illustrated by suggesting that an English court might disbar a bareheaded barrister, but presumably could not imprison a defendant who refused to wear a powdered wig. On the other hand, this example may merely invite close scrutiny of the adequacy of the justification for a ceremony which may be a composite of ritual and function. Does the fact that a practice "can reasonably be thought to contribute to the functioning of the court" really provide an adequate justification for a rule enforceable by summary imprisonment? See United States ex rel. Robson v. Malone, 412 F.2d 848, 850 (7th Cir. 1969). The precise issue presented here does not require a reexamination of the *Malone* holding, but the fact that a completely consistent application of *Malone* would admittedly lead to a "logical ab-

surdity" raises more doubts in my mind about the *Malone* rule itself than about its application to a defendant or an unobtrusive spectator.

11. After the defendant expressed a willingness to stand to show his respect for the judge as a human being, the judge insisted that such conduct would be inadequate, stating, in part: "Now if you will agree to stand, not to me as an individual, but as to the courts, then we will have no problems." See the colloquies quoted at pages 129–131 of Judge Cummings' opinion. The defect in the judge's analysis is explained by an excerpt from Mr. Justice Frankfurter's dissent in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 655, 63 S.Ct. 1178, 1193, 87 L.Ed. 1628:

"Law is concerned with external behavior and not with the inner life of man. It rests in large measure upon compulsion. Socrates lives in history partly because he gave his life for the conviction that duty of obedience to secular law does not presuppose consent to its enactment or belief in virtue. The consent upon which free government rests is the consent that comes from sharing in the process of making and unmaking laws.