**TEXAS PET FOODS, INC., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 5490.**

Court of Civil Appeals of Texas, Waco.

Oct. 31, 1975.

Judgment of Contempt Nov. 3, 1975.

Rehearing Denied Nov. 20, 1975.

Dunnam, Dunnam & Dunnam, Vance Dunnam, Waco, for appellant.

Bernard D. Newsom, Jr., Austin, for appellee.

HALL, Justice.

The problems posed on this appeal are the validity of a temporary writ of injunction,

and the disposition of a contempt action filed originally in this court based upon asserted violations of the temporary injunction committed during the pendency of the appeal.

Texas Pet Foods, Inc., operates a poultry rendering plant which by a process of cooking converts chicken and turkey offal, including feathers, into a protein supplement for animal feeds. The plant is located in McLennan County near the City of Waco.

The State of Texas brought this suit for temporary and permanent injunctive relief to prevent alleged violations by Texas Pet Foods of Section 4.01 of Article 4477–5, Vernon's Tex.Civ.St. (Texas Clean Air Act), and of Section 4 of Article 4477–6 (Texas Renderers' Licensing Act), and for the assessment of monetary penalties.

The offal is transported daily by the defendant in unrefrigerated trucks to its plant from several poultry processing plants in the vicinity of Waco. There are no refrigeration facilities at the defendant's plant.

Under ideal conditions, the defendant processes around the clock, alternately cooking ten hours, then cleaning up four hours, 5½ days per week; and there is little delay between delivery of the material into the plant and its processing. There are six cookers, each holding up to three tons of raw material. Feathers are rendered separately from the balance of the offal. The feathers cook in one hour; the other cooks in three hours. After cooking, the feathers are mechanically conveyed through a dryer, then a grinder, then in the form of meal into a storage bin. The other material follows the same route after leaving the cookers, except that its first stop is an expeller where oil is pressed from it and run into a tank. Again, under ideal plant conditions, odors emanating from the raw materials, the cookers, the expeller, the dryer, the finished meal, and the water used in the processing, are controlled and eliminated through a "scrubber system" in the plant and a "ridge-and-furrow system" in fields

outside the plant. Interworking with these systems, and necessary to their proper function, are fans, steam condensers, water-chlorination equipment for oxidizing particulate, filters, grease traps, recycle pumps, and a "hot well" aeration tank. Maintained and operated at optimum efficiency, the auxiliary equipment prepares vapors and the air in the plant for odor elimination in the scrubber system, and creates a negative air pressure in the plant thereby pulling the air and vapors through the scrubber system for elimination of odors, and also cleanses the water of all particulate and heavy odors before it is released to the ridge-and-furrow system for disposal. If any auxiliary equipment fails to work, or is permitted to operate inefficiently, the scrubber system and the ridge-and-furrow system cannot perform their functions, and offensive odors result.

The ridge-and-furrow system is a "no-discharge system" consisting of several five-acre tracts upon which the water is released in two-day rotations. A reed grass is cultivated on the ridges for evaporative disposal of the water and aerobic elimination of any odors remaining in it. The system was not designed to handle organic material, and any such material reaching the furrows will putrefy, cause offensive odors, and breed flies.

The scrubber system consists of two parts. There is a venturi-type scrubber which is designed to remove heavy odors, oil droplets, fine meal droplets, and other particulate from the air inside the plant. The second scrubber, the primary one, is a pack scrubber with packing material which can be contaminated with particulate matter. It is designed to handle only plant air from a low-odor source. It cannot handle the high-intensity odors coming from the cookers, expellers, dryers, and other plant areas; but an efficient venturi scrubber will precondition these odors for elimination by the pack scrubber. The scrubber system is an "intricate piece of equipment," according to the defendant's president. It was designed and installed by Environmental Research

Corporation, and their instructions for its operation, including control of the water flow rate, the air flow rate, chemical injections, and regular removal of particulate, must be closely followed, else the system will fail and odors will be emitted from the plant.

The trucks delivering offal enter the plant through an "air curtain" which is a series of fans designed to help maintain the negative pressure in the plant and also "keep odors in and flies out" at the truck entrance. If this air curtain does not function properly, then an outside wind velocity as light as 1.5 miles per hour will generate enough wind to defeat the negative air pressure system, render the scrubber system ineffective, and permit the venting of heavy odors through the door, small holes, or any opening.

### The Temporary Injunction

This suit was filed on July 18, 1975. Upon its filing, a temporary restraining order was issued against the defendant without notice. The State's application for a temporary injunction was heard on July 24th, and resulted in the following order:

### ORDER OF TEMPORARY INJUNCTION

BE IT REMEMBERED that on the 24th day of July, 1975, came on to be heard Plaintiff's application for temporary injunction in the above numbered and entitled cause and all parties through their respective attorneys of record having announced ready and having considered the contents of Plaintiff's verified Original Petition, and having heard and considered the evidence presented in this cause on the 24th and 25th day of July, 1975, this Court is of the opinion that the Defendant, Texas Pet Foods, Inc., has operated its poultry by-product rendering establishment on Old Marlin Road in McLennan County in a manner violative of the terms and conditions of the Texas Clean Air Act, Article 4477–5, V.A.C.S., and the Texas Renderer's Licensing Act,

Article 4477–6, V.A.C.S., and that unless restrained and enjoined therefrom will continue to violate the Texas Clean Air Act, Article 4477–5, V.A.C.S., and the Texas Renderer's Licensing Act, Article 4477–6 V.A.C.S.

IT IS THEREFORE ORDERED, ADJUDGED & DECREED that the Defendant, Texas Pet Foods, Inc., its officers, agents, representatives and employees is enjoined and prohibited pending final trial on the merits from causing or contributing to the presence in the atmosphere, in and around Defendant's Old Marlin Road poultry rendering facility, odors or particulate matter in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property or as to interfere with the normal use and enjoyment of animal life, vegetation or property.

IT IS FURTHER ORDERED, ADJUDGED & DECREED that the Defendant Texas Pet Foods, Inc., its officers, agents, representatives and employees is enjoined and prohibited, pending final trial on the merits, from violating the provisions of Section 4.01(a) and (b) of Article 4477–5, V.A.C.S., and Section 4(b) of Article 4477–6 V.A.C.S., both of which are attached hereto and incorporated herein for all purposes as if fully set forth in this Order.

IT IS FURTHER ORDERED, ADJUDGED & DECREED that Defendant, Texas Pet Foods, Inc., is enjoined and prohibited, pending final trial on the merits, from causing, suffering, allowing or permitting the collection, storage, handling, cooking or processing of poultry products and by-product materials at its Old Marlin Road, Waco, McLennan County, facility until such time as Defendant completes the following requirements:

1) Defendant shall repair all holes in the rendering plant structure and completely seal the entire building to prevent the emission of fugitive odors;

2) Defendant shall install a weighted tarp over the entire raw materials' room unloading area to prevent the emission of odors and the introduction of flies;

3) Defendant shall inspect and seal all product handling systems used in the transfer and processing of by-product materials to assure same are leak and spill-proof;

4) Defendant shall vent condensor and hot well exhaust gases, vapors and odors directly to Defendant's Venturri Scrubber;

5) Defendant shall repair or replace the chemical injection pump on the pack tower scrubbing system;

6) Defendant shall repair and seal all trailers and vehicles used in the transporting of raw materials and keep same from leaking;

7) Defendant shall remove all raw and processed poultry materials from rendering plant floors, walls, and equipment and shall thoroughly steam clean same prior to start-up operations and, after start-up, on a daily basis steam clean all in-plant floors;

8) Defendant shall install a recycling pump on the grease trap baffle system and remove all accumulated sludge from its baffle, filtration and chlorination units;

9) Defendant shall level the ridge and furrow waste-water distribution ditches so as to prevent standing water and assure adequate irrigation of ridge and furrow vegetation;

10) Defendant shall develope, reduce to writing, post in a noticeable plant location and insist upon employees following a regular daily cleaning procedure;

11) Defendant shall daily monitor and record the operation of all equipment within the rendering plant; said records are to be kept at the plant site for inspection by authorized regulatory officials; and

12) Defendant shall operate all odor abatement and waste-water treatment equipment according to the manufacturer's specifications.

The Clerk of this Court shall immediately cause Writ of this temporary injunction to issue.

SIGNED AND ENTERED THIS 28 DAY OF JULY, 1975.

Among other attacks mounted against the order, the defendant contends that it is not supported by evidence, that it alters the status quo and effectively determines the merits of the case, that it is unpermissibly vague in its terms, and that the trial court reversibly erred in refusing to hear evidence relating to a balancing of the equities. We overrule these contentions.

### a. *sufficiency of the evidence*

The rendering facility in question has been in use since 1961. The defendant has been operating it for five years. During these five years, and especially during the two years immediately preceding the hearing on the injunction in question, there has been a continued deterioration of the ridge and furrow system and of the plant building and equipment, aggravated by damage to the roof by a strong wind in April, 1975. During the past two years, enforcement officials of the Texas Air Control Board have sought voluntary compliance by the defendant with the Texas Clean Air Act and the Texas Renderers' Licensing Act with threats of "Board action," but with little concrete success. Meanwhile, residents in the area have called upon the officials asking, "Why, why, why can't something be done?" about the odors emanating from the plant.

Maurice Werblud, the defendant's president, testified that lately, because of equipment breakdowns, raw materials have had to wait in the trucks in the hot sun; that this causes putrefaction; that when breakdowns occur, including breakdowns in the scrubber system, the defendant continues

processing; that when water gets on the meal it creates a "horrible situation" making it "gluey and odorous" and causing the development of maggots in it in "a very short time." He said that there is "no excuse for a dirty, unsanitary operation in the plant" and no excuse for "bloody, stagnant ponds" in the ridge-and-furrow fields.

Investigations by supervisors of the Texas Air Control Board from May 1, 1975 to within two days of the hearing revealed the following circumstances, among others, reported by them:

1. The building was not well sealed and had numerous holes and cracks through which odors could and did escape.

2. The air curtain was not functioning properly, and outside doors were often left open by the defendant's employees.

3. Processing and conveyor equipment were subject to constant and substantial spillage of poultry materials; raw and processed materials generally covered the plant floors; raw materials were "hanging everywhere"; feathers, blood, oil, and partially cooked material were spilled and piled under the cookers; and there were piles of meal wet with water.

4. There were no established cleaning, maintenance, and sanitation practices posted for or followed by the employees.

5. The condenser and hot well ducts were disconnected; the gases, vapors and odors from this equipment were by-passing the venturi scrubber; and the pack scrubber was thereby clogged with meal powder substantially reducing its efficiency.

6. The chemical injection pump on the pack scrubber was inoperable.

7. The recycling pump, required by the defendant's license from the Texas Air Control Board, had not been installed; and an inefficient filtration system improvised and installed by the defendant in lieu of the recycle pump was clogged with grease and sludge.

8. The ridge and furrow system was receiving organic solids; it was not maintained sufficiently level to permit water to properly flow throughout the system; and stagnant, odorous water was standing in the fields.

9. No bona fide attempt was being made to operate and maintain plant equipment in accordance with the manufacturers' instructions.

10. The trucks transporting raw material often leaked and spilled poultry solids and blood on the plant grounds.

11. The overall condition of the plant and its operation showed an established lack of concern on the part of the defendant's personnel for the general state of repair of the building and equipment, for cleanliness and sanitation, and for the prevention and elimination of odors.

12. "Obnoxious odors, very strong odors, objectionable odors," were emanating from the plant and carrying across neighboring lands.

For several years, plant odors have disturbed the rest and comfort of the residents of the area and the enjoyment by them of their properties; have injuriously affected the health of the residents; and have appreciably depreciated the value of neighboring properties. The area residents testified that the odors are "very unpleasant and nauseating . . . extremely strong . . . like a dead, decayed animal that you're burning . . . a potent cooked, dead animal odor . . . a nasty odor . . . like a dead body . . . obnoxious . . . awful . . . sickening, dead odor . . . very bad, offensive odor . . . foul, stinking odor . . . like rotten flesh . . . make my wife and little girl sick . . . caused my wife to vomit . . . you cannot stay outside when they hit . . . it will drive you in the house . . . can't entertain outside . . . no barbecues, no watermelon cuts . . . it's em-

barrassing if company is present . . . you never know when it will hit . . . people come out [about buying my house] and this odor appears and they say, 'well, just forget it' . . . gradually built up to worse and worse . . . gradually built up worse since Texas Pet Foods Company is running it."

This recitation is only a summary of the proof. A complete review of the record shows an abundance of evidence supporting the trial court's order.

The defendant argues that the State's proof was limited to past acts without any proof of probable recurrence, and that for this reason the evidence is insufficient to support the temporary injunction. We disagree.

■■ It is true that past and discontinued acts will not support injunctive relief if there is nothing to indicate a probability that they will recur. 31 Tex.Jur.2d 69, Injunctions, § 22. However, where, as here, the proof shows that the activity complained against would support relief and has been a settled course of conduct by the defendant continuing to or near the time of trial, the courts may assume that it will continue absent clear proof to the contrary and issue the injunction. This rule was recognized in the case of *Alamo Title Company v. San Antonio Bar Association*, 360 S.W.2d 814 (Tex.Civ.App.—Waco, 1962, writ ref., n. r. e.), an unauthorized practice of

law case, wherein this court said [at p. 817], "In view of appellant's course of operation as shown by the evidence, notwithstanding appellees' efforts to terminate it amicably, injunction was not precluded by the fact that Brown [appellant's lawyer-agent] had become incapacitated and had retired from law practice; that under prospect of impending litigation there was a declared resolve to abandon former practices; or that during trial there was announced renunciation of conduct, assurance of non-resumption, intention to refrain, or alteration of plans."

■ Our record supports the trial court's determination that without the injunction, the defendant's violations of the statutes in question will continue.

b. *vagueness*

■ The decretal portion of the order is broken into three paragraphs. The first enjoins the emission into the atmosphere of odors or matter "in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property or as to interfere with the normal use and enjoyment of animal life, vegetation or property." The second enjoins violations of the provisions of pars. (a) and (b), sec. 4.01, of article 4477–5,[1] and par. (b), sec. 4, of article 4477–6.[2] The third enjoins

1. These provisions of the Texas Clean Air Act prohibit the emission of any air contaminant or any activity which causes or contributes to air pollution. "Air contaminant" is defined in the Act to mean "particulate matter, dust, fumes, gas, mist, smoke, vapor or odor, or any combination thereof produced by processes other than natural"; and "air pollution" is defined as "presence in the atmosphere of one or more air contaminants or combinations thereof, in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property, or as to interfere with the normal use and enjoyment of animal life, vegetation or property."

2. These provisions of the Texas Renderers' Licensing Act set forth specific require-

ments which must be followed by renderers, designed to make their operations and processes "sanitary," to "prevent the spread of infectious and noxious materials," and to "assure finished products which are free from disease-producing organisms." Particularly relevant to our case are these requirements: all vehicles used in transporting raw materials shall be leakproof; all raw materials received on the rendering plant premises shall be placed in the rendering process immediately or shall be stored for a period of not more than 48 hours in a manner that will prevent malodorous condition; adequate and suitable means for treatment of cooking vapors shall be provided and operated in such a manner as to control odors; during operations the floors in processing areas shall be kept reasonably free from

operation of the defendant's plant until the defendant complies with twelve enumerated requirements.

Rule 683, Vernon's Tex.Rules Civ.Proc., requires every order granting an injunction to "be specific in terms" and "describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." The defendant challenges each injunctive paragraph of the order, contending that none satisfy the specificity required by Rule 683. It says that a determination of what is an offending odor within the first paragraph will vary from person to person, depending upon the degree of hypersensitivity or callousness of the individual, and that the requirement is therefore nebulous and uncertain. It asserts that the reference to statutes upon which the second decretal paragraph is based is patently void for lack of preciseness. And it argues that "many of the twelve requirements [in the third paragraph] are likewise void for lack of definiteness such as ordering the defendant to level a field without stating what degree of slope or what is denoted by the term 'level', ordering him to repair the injection pump, and ordering him to repair all trailers and vehicles without specifying what repairs, and ordering the defendant to operate all odor abatement and waste water treatment equipment according to the manufacturer's specifications without stating what the specifications are or whether they are written or oral." We overrule these contentions.

In *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 156 Tex. 7, 291 S.W.2d 697, 702 (1956), our Supreme Court said, " 'An injunction decree must be as definite, clear and precise as possible and *when practicable* it should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing' . . . But obviously the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or (what is far more likely) in somewhat different form calculated to circumvent the injunction as written. And obviously, too, the decree cannot prejudge new situations, which were not before the court in the first instance, whether prejudging them as nonviolations or violations of its general terms. Nor should it be greatly concerned with rights of the defendants that are asserted largely in the abstract. Otherwise it would probably take longer to write the decree than it would to try the case, and the injunction might well become unintelligible and self-destructive."

The identical attack of vagueness made by the defendant against the definition of "air pollution," upon which the first two injunctive paragraphs are based, was made and rejected in the case of *Houston Compressed Steel Corp. v. State* (Tex.Civ.App.—Hou. 1st, 1970, no writ hist.), 456 S.W.2d 768, 774. The Court said:

"Until 1967 the basis of our laws regarding pollution was the nuisance doctrine, but the emphasis of our newer statutes is on regulatory standards. The science of air pollution control is new and inexact, and these standards are difficult to devise, but if they are to be effective they must be broad. If they are too precise they will provide easy escape for those who wish to circumvent the law. Air pollution is defined in Sec. 1.03(3) of the Act: ' "Air pollution" means the presence

processing wastes, including blood, manure, scraps, grease, water, dirt, and litter, and the floors shall be thoroughly cleaned at the end of each day's operation; such equipment and utensils shall be provided as are necessary for the rendering establishment to conduct its operations in a sanitary manner; the immediate premises shall be kept in a clean, neat condition and shall be reasonably free from undue collection of refuse, waste materials, rodent infestation, insect-breeding places, standing pools of water, *and other objectionable conditions;* and the rendering establishment shall be kept in good repair.

in the atmosphere of one or more air contaminants or combinations thereof, in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property, as to interfere with the normal use and enjoyment of animal life, vegetation or property.' This definition is clear and is easily capable of understanding."

The definition of "air pollution" in the Texas Clean Air Act upon which the first two paragraphs of the injunction are based is not unlike the terms of the ordinance challenged as vague in *Ex parte Hunter* (1945), 148 Tex.Cr.R. 462, 188 S.W.2d 162, which prohibited the keeping of "any animal, fowl or bird which by causing frequent or long continued noise shall disturb the comfort and repose of any person in the neighborhood thereof." The court said, "We are unable to sustain the relator's contention that the ordinance is indefinite in that it does not define what is meant by 'frequent or long continued noise,' 'comfort and repose,' and 'neighborhood.' Such terms are of general use and may be understood." The court went on to say that citizens are entitled to protection from discomforting noises "to such extent that normal, reasonable persons may enjoy rest and the comforts of home."

The first paragraph of the injunctive order and the statutes upon which it is based are not impermissibly vague. By force of their terms, contamination of the air is prohibited that adversely affects and is injurious to human health and property and that interferes with the normal use and enjoyment of property. In view of the broad range of the subject matter, the standard prescribed and the activity proscribed can hardly be stated more precisely.

■ The defendant's challenge to the second paragraph is based upon the assumption that a reference is made therein to guidelines outside the injunction. This is not so. The order incorporates the statutes which are attached to it and are a part of it.

The attachments are part of the order. The order is complete within itself. Rule 683 is not violated. Cases cited by the appellant in which the injunctions do refer the defendant to instruments and statutes dehors the order for standards of conduct are simply not in point.

■ The third paragraph of the temporary injunction mandates the accomplishment of twelve conditions precedent to the continued operation of the defendant's plant. The record supports the implied finding that these undertakings are minimum requirements for the prevention of further air pollution by the defendant and resulting injury to neighboring residents. They are set forth in plain, intelligible terms, and, again are as precise as the subject matter permits or requires.

### c. *status quo and the merits*

■ The defendant argues that the third paragraph enjoining the operation of the plant until the twelve requirements set forth are met destroys the status quo and effectively determines the merits of the dispute. This argument is based upon the erroneous premise that the status quo was "the operation of the plant over a long term [of at least ten years] with the then existing physical equipment, facilities, and conditions." The status quo to be preserved by temporary injunction is "the last, actual, peaceable, noncontested status which preceded the pending controversy." *Transport Co. of Texas v. Robertson Transports*, 152 Tex. 551, 553, 261 S.W.2d 549, 553 (1953). This suit was brought to enjoin the asserted emission of unnatural, air polluting odors by the defendant's plant in violation of state statutes. The status quo, therefore, would be the last operation of the plant which was not violative of the statutes.

Mandatory temporary injunctions have long been considered proper when warranted by the facts of the case. In *McMurrey Refining Co. v. State* (Tex.Civ.App.—Austin, 1941, writ ref.), 149 S.W.2d 276, 279, the court said that the status quo in actions to

enforce a mandatory statutory duty like the one before us " 'is a condition of action and not of rest,' the disturbance of which lies, not in enjoining mandatorily compliance with it, but in failing or refusing to comply"; that this class of cases "has been repeatedly held to constitute an exception to the general rule that temporary injunction may not be resorted to to obtain all relief sought in the main action"; and that "such temporary injunction may be mandatory in character." Cf. 31 Tex.Jur.2d 85, Injunctions, § 33; and 6 Texas Practice 185, 191, Injunctions and Other Extraordinary Proceedings, §§ 153, 155; and the many cases cited in those references.

■ The mandatory features of the injunction in question were not improper under the record. They do not amount to a final determination of the case on its merits. No evidence was presented by the defendant to contradict the State's proof of the cause, nature, and extent of the air pollution and the serious injuries inflicted upon the neighboring residents. Nor is there any proof of another better solution for the temporary abatement or lessening of the pollution than the undertakings required by the court. The record supports the implied findings that these requirements are the minimum necessary to prevent further air pollution by the defendant with more resulting injury to the physical health of the residents, pending the hearing on the merits. All of the requirements fall within the provisions of the statutes and the terms of the defendant's rendering plant license from the State.

■ Finally, there can be no doubt that the issuance of a mandatory injunction is permissible by statute in cases of this nature if warranted by the facts. Section 4.04 of Article 4477–5 provides that in any suit brought to enjoin a violation or threat of violation of the Texas Clean Air Act the court may grant "any prohibitory or mandatory injunction the facts may warrant including temporary restraining orders after notice and hearing, temporary injunc-

tions, and permanent injunctions"; and in any injunction suit brought to compel compliance with the Texas Renderers' Licensing Act, or to restrain any actual or threatened violation of it, provision is made in section 19 of Article 4477–6 for the court to order "such preliminary or final injunction as may be deemed proper."

#### d. balancing the equities

■ On the hearing of the temporary injunction, the defendant tendered proof for the court to consider in "balancing the equities." This consisted of proof of the cost of the defendant's plant, the number of its employees, and testimony that several Central Texas poultry processing companies employing collectively over 1,000 persons will cease operating if the defendant is closed. The trial court refused to consider balancing the equities, and error is assigned to this ruling.

The defendant stands charged with violations of state statutes. The same statutes which condemn the activity charged against the defendant also provide for its prohibition by injunction. Under these circumstances, if a continuing violation of the statute is established the rule for the balancing of equities has no application. *Red Lake Fishing & Hunting Club v. Burleson* (Tex.Civ.App.—Waco, 1949, writ ref.), 219 S.W.2d 115, 118; *Gulf Holding Corporation v. Brazoria County* (Tex.Civ.App.—Hou. 14th, 1973, writ ref., n. r. e.), 497 S.W.2d 614, 619; *Langford v. Kraft (Tex.Civ.App. —Beaumont, 1973, writ ref., n. r. e.), 498 S.W.2d 42, 48; City of Corpus Christi v. Lone Star Fish & Oyster Co.* (Tex.Civ.App. —San Antonio, 1960, no writ hist.), 335 S.W.2d 621, 623. As we have shown, the record before us supports the implied findings that the defendant's operation is a continuing violation of the statutes. The court did not err in refusing to consider the balancing of equities.

The defendant brings forward other points and contentions of error. We have given careful study to every complaint, ev-

ery argument, every case cited. Under the record as a whole, the order granting the injunction does not constitute an abuse of discretion. It is affirmed.

### The Contempt Action

On August 13, 1975, the State filed a motion for leave to file an affidavit with this court to have the defendant and its president, Maurice Werblud, held in contempt for specified violations of the temporary injunction allegedly occurring on and between August 11th and the time of the filing of the motion. Following the granting of the motion the affidavit was filed. A hearing held thereon by this court without a jury on August 21st and 22nd, resulted in factual and legal conclusions (fully set forth in the judgment of contempt separately filed in this case) finding and holding the defendant and Werblud in contempt.

Prior to the hearing, the contemners answered the affidavit, asserting that (1) the injunction was void and would not support a contempt decree; (2) this court did not have jurisdiction to entertain the contempt action; and (3) they were entitled to a jury on the hearing of the question.

Most of the reasons assigned in the contemners' answer for holding the injunction void were restatements of the attacks made against the injunction on the appeal, and we shall not further deal with them in this opinion.

The record, including stipulations of the parties, shows that the trial court initially permitted the superseding of the temporary injunction decree. Supersedeas bond was posted by the defendant on July 25, 1975. The injunction order was rendered, reduced to writing, and signed by the trial judge on July 28th. On August 5th, on the State's motion, the court set aside its order allowing supersedeas. Later, on the same day, the transcript on appeal of the injunction was filed with this court.

Upon the filing of the transcript with this court within twenty days after the rendition of the order granting the temporary injunction the jurisdiction of this Court attached as to that feature of the case. Rule 385, Vernon's Tex.Rules Civ.Proc.; *Crow v. Batchelor* (Tex.Sup., 1970), 453 S.W.2d 297. Our Supreme Court held, in *Ex parte Travis*, 123 Tex. 480, 73 S.W.2d 487, 489 (1934), that under these circumstances, once the appeal is perfected, only the appellate court has the authority to enforce compliance with the injunction. The court said:

"After the jurisdiction of the Appellate Court attached, it alone was clothed with the power to adjudicate the validity or invalidity of the temporary injunction and to exercise the discretion involved in compelling obedience to the injunction pending the appeal, as well as to enforce its own final judgment, unless or until such judgment was subjected to review by a higher court. The district court could exercise no such authority while power to consider and determine these very matters lay exclusively in a higher court."

This rule was expressly restated and reaffirmed by the Supreme Court in the recent case of *Ex parte Conway* (Tex.Sup., 1967), 419 S.W.2d 827, 829. Accordingly, we overruled the contemners' plea to the jurisdiction.

Contempt is of two classes, civil and criminal. Civil contempt is the failure to do what is ordered to be done; criminal contempt is the doing of what has been prohibited. The fine or imprisonment assessed for the former is coercive and remedial; for the latter, the fine or imprisonment assessed is punitive. *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966).

From the cases of *Cheff v. Schnackenberg*,[3] 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966); *Dyke v. Taylor Imple-*

---

**3.** It is of interest that in *Cheff* the contemners were tried before a panel of three judges of an intermediate appellate court without a jury.

*ment Mfg. Co.*, 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968); *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); *Frank v. United States*, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); *Codispoti v. Pennsylvania*, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974); and *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), we learn:

1. Insofar as an alleged contemner's right of trial by jury is concerned, criminal contempt is treated like other criminal offenses.

2. Federal constitutional due process (Fourteenth and Sixth Amendments) does not require a jury trial for "petty" criminal offenses.

3. A petty offense is one for which the penalty prescribed does not permit a term of imprisonment of more than six months.

4. In prosecutions for criminal contempt, where no maximum penalty is authorized by the legislature the severity of the penalty actually imposed is the best indication of the seriousness or pettiness of the particular offense.

5. If a maximum penalty is provided by statute for criminal contempt, then that penalty is the relevant criterion of the seriousness of the offense.

6. Sentences of up to six months imprisonment for criminal contempt classed as petty offenses may constitutionally be imposed without a jury trial.

7. Where several acts of criminal contempt classed as petty offenses are tried together, the contemner is not entitled to trial by jury if the aggregated punishment imposed does not require imprisonment in jail for a term of more than six months.

■ In Texas, by legislative fiat, one guilty of contempt in any court other than a justice or municipal court is subject to a fine of not more than $500, or to confinement in jail for any term of not more than six months, or to both the fine and the imprisonment. Article 1911a, Vernon's Tex.Civ.St. This statute classifies the criminal contempt charges in question as petty offenses. They were triable without a jury, unless the aggregated punishment assessed for all required imprisonment in jail for a term of more than six months. It did not, as is shown by the appended copy of the judgment of contempt rendered by this court.

## APPENDIX

### JUDGMENT OF CONTEMPT

### NOVEMBER 3, 1975

On this 21st day of August, 1975, in the above entitled and numbered cause on the docket of this Court, came on to be heard and considered the affidavit of the State of Texas to have Texas Pet Foods, Inc., and its president, Maurice Werblud, found and held to be in contempt for asserted violations of an order of temporary injunction heretofore rendered by the 54th Judicial District Court of Texas, the validity of which is presently on appeal in this Court; and also came on to be heard and considered the answer to said affidavit; and came Texas Pet Foods, Inc., by and through its president, Maurice Werblud, and by its attorneys of record; and came Maurice Werblud, individually, in person and by and through his attorneys of record; and came the State of Texas, by and through the Attorney General of Texas;

And the Court having considered the pleadings of the parties, the evidence adduced, and the arguments of counsel, and having found and determined that heretofore, on the 28th day of July, 1975, in cause number 75–1571–2 on the docket of the 54th Judicial District Court of Texas, styled *The State of Texas vs. Texas Pet Foods, Inc.,* the following order of temporary injunction was duly rendered in said Court, to wit:

[Editor's Note: the judgment here sets out the full text of the temporary injunc-

[tion order. The text appears supra, p. 824, and is not repeated here.]

And the Court having further found and determined that on the 5th day of August, 1975, the appeal of said order of temporary injunction was duly perfected to this Court by Texas Pet Foods, Inc.;

And the Court having further found and determined that on the consecutive days of August 11, 1975, and August 12, 1975, Texas Pet Foods, Inc., and Maurice Werblud, individually and in his capacity as president of Texas Pet Foods, Inc., did knowingly and willfully violate said order of temporary injunction on each of said days (1) by causing the presence of odors in the atmosphere in and around the poultry rendering facility of Texas Pet Foods, Inc., of such concentration and of such duration that they were injurious to and adversely affected human health and welfare and property and interfered with the normal use and enjoyment of property; (2) by failing to repair all holes in the rendering plant structure and completely seal the entire building to prevent the emission of fugitive odors; (3) by failing to seal all product handling systems used in the transfer and processing of by-product materials to assure same are leak and spill-proof; (4) by failing to vent condensor and hot well exhaust gases, vapors and odors directly to the defendant's venturi scrubber; (5) by failing to remove all raw and processed poultry materials from rendering plant floors, walls, and equipment and thoroughly steam same prior to start-up operations and on a daily basis thereafter; (6) by failing to level to the ridge-and-furrow system ditches so as to prevent standing water and assure adequate irrigation of ridge-and-furrow vegetation; (7) by failing to develop, reduce to writing, post in a noticeable plant location, and insist upon employees following, a regular daily cleaning procedure; and (8) by failing to operate all odor abatement and waste-water treatment equipment according to the manufacturer's specifications;

And the Court having further found and concluded that Texas Pet Foods, Inc., Maurice Werblud are in contempt for said acts of violation of the order of temporary injunction, and that said contemners should be separately punished by a fine of $500.00 for each day of said acts of contempt;

Now, therefore, it is ordered, adjudged and decreed that Texas Pet Foods, Inc., and Maurice Werblud are in contempt of this Court for said separate violations by each of them on said two consecutive days;

It is further ordered, adjudged and decreed that Texas Pet Foods shall be, and it is hereby, punished by a fine of $500.00 for each of said two days of contemptuous acts (totaling $1,000.00); and that Maurice Werblud shall be, and he is hereby, punished by a fine of $500.00 for each of said two days of contemptuous acts (totaling $1,000.00); and that the costs of this proceeding shall be, and they are hereby, assessed against said contemners; for which execution may issue;

It is further ordered that a capias shall forthwith issue to any Sheriff within the State of Texas commanding him to arrest the said Maurice Werblud and place him in jail and there safely keep him imprisoned until said fines and said costs are paid; and it is ordered that said capias shall recite generally the proceedings had in this case, and that it shall be accompanied by a certified copy of this judgment to be served upon the said Maurice Werblud as further evidence of the Sheriff's authority;

And it is further ordered that if said fines shall be satisfied by confinement in jail at the rate provided therefor by law, then they shall run and be satisfied concurrently.