**Ex parte Charles E. KRUPPS, Harold O. Edgington, H.O. Mathews, Vincent Rose, Lattie Rose, Rose Henley & John Henley, Applicants.**

**No. 69491.**

Court of Criminal Appeals of Texas, En Banc.

June 11, 1986.

Joseph C. Hawthorn, Tom Brandon, Beaumont, for applicants.

James S. McGrath, Dist. Atty. and Lavon L. Jones, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

This is an original application for writ of habeas corpus in which seven applicants seek relief from a judgment holding them in contempt of County Court at Law No. 3 of Jefferson County. Applicants (Charles Edward Krupps, Harold O. Eddington, Howard D. Matthews, Sr., Vincent Rose, Lattie Jo Darby Rose, Rosie Henley, and John Ellis Henley) were summarily held in contempt of Respondent Donald J. Floyd on June 14, 1985 for "being disrespectful by failing to rise upon the entrance of the Court after being duly admonished and warned of consequences of their failure to do so." Applicants' punishment was fixed at thirty days confinement in the county jail.

Applicants urge three grounds for relief. First, applicants claim that the order of contempt is void because the trial court failed to provide them with due process. Second, applicants claim that there is no evidence which would support a contempt conviction. Third, applicants claim that the First Amendment's Free Exercise Clause

creates an exemption to the "rising" requirement.

The record is presented to this Court largely in the form of affidavits. Although the use of affidavits presents this Court with the unusual circumstance of an informal record, such informality is not without precedent in a direct contempt. See *Ex parte Herring*, 438 S.W.2d 801, 803 (Tex. 1969); *Ex parte Hosken*, 480 S.W.2d 18, 22, n. 4 (Tex.Civ.App.—Beaumont 1972). As the Supreme Court has noted:

> "A contempt holding depends in a very special way on the setting, and such elusive factors as the tone of voice, the facial expressions, and the physical gestures of the contemnor; these cannot be dealt with except on full ventilation of the facts. Those present often have a totally different impression of the events from what would appear even in a faithful transcript of the record." *In re Little*, 404 U.S. 553, 556, 92 S.Ct. 659, 661, 30 L.Ed.2d 708 (1972) (Burger, C.J., concurring).

This is especially true where, as here, this Court must review the trial court's decision based on affidavits. Therefore, we review the affidavits with caution and restraint.

On June 13, 1985, Applicant Krupps appeared as a pro se defendant in County Court at Law No. 3 in Jefferson County before Respondent Judge Donald J. Floyd. The purpose of the appearance was to proceed upon a trial de novo from a conviction in Justice of the Peace Court for operating a motor vehicle without liability insurance. The other applicants had accompanied Krupps and were present as spectators. Upon completion of voir dire, court was recessed and the bailiff, Deputy Ben Collins, advised everyone to rise. As Judge Floyd exited the courtroom, the bailiff noticed that the applicants did not stand. The bailiff advised the applicants that in the future they were to stand whenever a judge entered or exited a courtroom. The applicants responded that they would con-

tinue to remain seated. The bailiff notified Judge Floyd of the applicants' intentions. The trial remained recessed until the following morning.

On June 14, 1985, before court convened, Judge Floyd instructed applicants, through the bailiff, that they would be held in contempt if they continued to refuse to rise. Several spectators left the courtroom at this point, deciding to stay outside until after court had convened. However, applicants again informed the bailiff that they would not rise. The bailiff informed Judge Floyd that the applicants had indicated they would continue to refuse to rise upon entrance of the judge. Judge Floyd then had the bailiff bring Krupps to his chambers. In the presence of Deputy Collins, Deputy Pat Pilgrim and Judge Floyd, Krupps made it clear that he would continue to refuse to stand. He explained to the judge that, as a "follower of Christ," he could not rise upon the entrance or exit of a judge. Judge Floyd offered applicants, through Krupps, the alternative of remaining outside of the courtroom until court had convened.[1] Krupps again refused. Judge Floyd continued to advise Krupps that such a refusal was contemptuous. Krupps then returned to the courtroom.

When court convened, the bailiff advised everyone to rise. The applicants did not stand, and Judge Floyd held them in contempt of court.

Applicants initially argue that they were not accorded due process in their contempt adjudication. The due process required for a particular contempt adjudication depends upon the type of contempt which has occurred. Contempts in Texas are divided into two types: direct and constructive. 13 Tex.Jur.3d, *Contempt*, § 2, p. 183.

In *Ex parte Supercinski*, 561 S.W.2d 482 (Tex.Cr.App.1977), this Court describes acts constituting direct contempt as those in which the court knows all of the secondary facts. Direct contempt is further de-

---

1. Judge Floyd stated in his affidavit:
 I explained that I did not want to hold them in contempt and place them in jail so why couldn't they step outside until Court convenes and then return once the proceedings started. He stated they would not do. that.

fined in Black's Law Dictionary as "[t]hose [acts] committed in the immediate view and presence of the court or so near the presence of the court as to obstruct or interrupt the due and orderly course of the proceedings." Black's Law Dictionary (Fifth Ed. 1983), 168.

Direct contempt adjudications satisfy the demands of due process through summary conviction and punishment without the need for prior notice or a hearing. *Ex parte Harvill*, 415 S.W.2d 174 (Tex.1967); *Ex parte Norton*, 144 Tex. 445, 191 S.W.2d 713 (1946). "Direct contemnors are not entitled to notice of the contempt charge or a hearing because there is no factual dispute arising from contemptuous behavior that occurs in the court's presence." *Ex parte Gordon*, 584 S.W.2d 686, 688 (Tex. 1979).

The United States Supreme Court has recognized the power of Texas courts to use summary procedures in cases involving direct contempt. *Fisher v. Pace*, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569 (1949). In *Fisher*, supra 69 S.Ct. at 427, the Court reasoned:

> "Historically and rationally the inherent power of courts to punish contempts in the face of the court without further proof of facts and without aid of jury is not open to question. This attribute of courts is essential to preserve their authority and to prevent the administration of justice from falling into disrepute. Such summary conviction and punishment accords due process of law."

The Court, in a footnote, added that "[t]his rule is well established in Texas." Id., 69 S.Ct. at 427 n. 4.

Constructive contempt has been defined as relating to "acts which require testimony to establish their existence." *Ex parte Cooper*, 657 S.W.2d 435, 437 (Tex.Cr.App. 1983). Constructive contempt is further defined in Black's Law Dictionary as "[t]hose [acts] which arise from matters not occurring in or near the presence of the court, but which tend to obstruct or defeat the administration of justice, ..." Black's Law Dictionary (Fifth Ed.1983), 167.

In *Cooper*, supra, the Court found the failure of an attorney to appear in court to be an example of constructive contempt. Such an occurrence constitutes an act which happened outside the presence of the court and upon which testimony will be required in order to discover the relevant facts.

Constructive contempt adjudications satisfy the demands of due process by requiring that the contemnor be given notice, a hearing and the opportunity to obtain an attorney. *Ex parte Hodge*, 389 S.W.2d 463 (Tex.1965); *Ex parte Flournoy*, 159 Tex. 425, 312 S.W.2d 488 (1958). These due process requirements are necessary because all of the elements of the offense are not personally observed by the court. *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Ex parte Pyle*, 134 Tex. 148, 133 S.W.2d 565 (1939).

With this understanding of the due process differences in direct and constructive contempt adjudications, we now must determine whether the facts of the instant case warrant a direct or constructive contempt proceeding, or both.

In the instant case Bailiff Collins instructed the six applicants to rise. They refused to do so. Judge Floyd, through Bailiff Collins, instructed the six that, should they refuse to rise, they would be held in contempt. The affidavit of Bailiff Collins makes clear that the six applicants understood that the threat of contempt originated with Judge Floyd. Applicants again refused to rise. Bailiff Collins informed Judge Floyd that the applicants would refuse to rise upon his entrance into the courtroom. When Judge Floyd entered he saw that the applicants had not risen and held them in contempt.

 Bailiff Collins, as an officer of the court,[2] admonished the applicants at the

---

2. Article 36.24, V.A.C.C.P. reads in relevant part: The sheriff of the county shall furnish the court with a bailiff during the trial of any case to attend the wants of the jury and to act under the direction of the court.

behest of Judge Floyd.[3] He made clear to the applicants that the admonition originated with Judge Floyd. The judge was advised that the applicants intended to refuse to rise when he entered. The applicants did in fact remain seated when Judge Floyd entered the courtroom and were consequently held in contempt and sentenced to thirty days in jail. Therefore, the admonishment was made in the presence of a court officer acting under direct instruction from the judge. The act which constituted the contempt, the applicants' failure to rise after being admonished, occurred in the presence of the judge. Thus, the entire act of contempt occurred in the presence of the court[4] making this direct contempt. Under these circumstances, the use of summary direct contempt proceedings were proper and did not violate applicants' due process rights.

Krupps, relying upon *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) and *Ex parte Avila*, 659 S.W.2d 443, (Tex.Cr.App.1983), argues that this Court has extended the requirements of notice and hearing to direct contempt proceedings. Neither *Taylor* nor *Avila* supports such a conclusion.

In *Taylor*, supra, the Supreme Court reversed a direct contempt conviction of an attorney because the trial judge denied the attorney notice and a hearing, waiting until the conclusion of the trial for sentencing. The Court held:

"This procedure does not square with the Due Process Clause of the Fourteenth Amendment. We are not concerned here with the trial judge's power, for the purpose of maintaining order in the courtroom, to punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him. [Citation omitted] The usual justification of necessity [citation omitted] is not nearly so cogent when final adjudication and sentence are postponed until after trial. [footnote omitted] Our decisions establish that summary punishment need not always be imposed during trial if it is to be permitted at all. In proper circumstances, particularly where the offender is a lawyer representing a client on trial, it may be postponed until the conclusion of the proceedings. [citation omitted]" *Taylor*, supra, 94 S.Ct. at 2703–2704.

In the instant case, the trial judge adjudicated the contempt and sentenced applicants in one act. He did not postpone his sentencing until after Krupps' trial. In addition, the instant case did not involve the sensitive issue of an attorney being placed in the position of defending himself against a contempt charge while also attempting to defend his client in trial. The Court in *Taylor*, supra, did not expand the due process requirements in a direct contempt adjudication beyond the summary proceeding present in the instant case where the trial judge adjudicates the contempt and sentences a contemnor immediately.

In *Avila*, supra, the trial court held an attorney in constructive contempt without providing notice or hearing. We held that such summary proceedings violated the specific statutory requirements of Art. 1911a, § 2(c), V.A.C.S.[5] and the general due

---

**3.** Black's Law Dictionary defines bailiff as:

A court officer or attendant who has charge of the court session in the matter of keeping order, custody of the jury and custody of prisoners while in court.

See also *United States v. McCabe*, 129 Fed. 708 (1st Cir.1904); *People v. Robarge*, 41 Cal.2d 628, 262 P.2d 14 (concurring opinion).

**4.** In *Ex parte Aldridge*, 169 Tex.Cr.R. 395, 334 S.W.2d 161, 165 (App.1959), this Court said:

[t]he wording 'in the presence of the court' does not necessarily mean 'in the presence of the judge of the court. The court is present whenever any of its constituent parts are engaged in the prosecution of the business of the court ...

**5.** In *Avila*, supra 659 S.W.2d at 445, we observed "that a common sense reading of Art. 1911a, Sec. 2(c), supra, requires, in essence, a trial de novo once its provisions have been invoked by a contemnor. That is, once the offended judge has made a determination that *an officer of the court* is in contempt of court, and the contemnor invokes his mandatory right to a hearing before another judge, the statute requires that the guilt or innocence shall be determined by a judge other than the offended judge."

process required in constructive contempt adjudications. Id.

■ The instant case is markedly different from *Avila*, supra, because, in the instant case, applicants were held in direct contempt. In addition, the contempt conviction in the instant case was not directed at an officer of the court; therefore, the broader due process requirements of Article 1911a, § 2(c), supra, are inapplicable. Both *Taylor*, supra, and *Avila*, supra, therefore, are distinguishable.

We find that, in applicants' adjudication, the trial court acted consistent with the due process required in a direct contempt proceeding.

Applicants also argue that a conviction for contemptuous conduct in Texas can only be upheld if the conduct "obstructs, or tends to obstruct, the proper administration of justice." *Ex parte Jacobs*, 664 S.W.2d 360 (Tex.Cr.App.1984); *Ex parte Salfen*, 618 S.W.2d 766 (1981). He then argues that the evidence in the instant case is insufficient to support a finding of contempt; therefore, the judgment of contempt is void. See *Deramus v. Thornton*, 160 Tex. 494, 333 S.W.2d 824, 830 (1960).

We noted earlier that contempts are classified as either direct or constructive when deciding the due process required in their adjudication. A similar decision is required when deciding what grounds for contempt are available to a court in a contempt adjudication.

Contempts are either criminal or civil in nature. 13 Tex.Jur., *Contempt*, § 3, p. 186; 17 C.J.S., *Contempt*, § 5(2), p. 12. Criminal contempt results from doing that which the court has prohibited; civil contempt generally results from failing to follow an order of the court. *Texas Pet Foods, Inc. v. State*, 529 S.W.2d 820 (Tex. Civ.App.—Waco 1975), writ ref'd n.r.e. In

addition, a proceeding which has as its purpose to punish a contemnor through fine or imprisonment is classified as criminal; the contempt is considered civil if the purpose of the sentence is coercive or remedial. Id.

■ In the instant case, Judge Floyd clearly held applicants in contempt for conduct which was prohibited. The sentence of thirty days in jail had as its purpose to punish applicants for refusing to stand. The contempt proceeding, therefore, was criminal in nature.

Common law criminal contempt is not restricted only to conduct that obstructs, or tends to obstruct, the proper administration of justice.[6] "[C]riminal contempts are all those acts in disrespect of the court, or of its process, or which obstruct the administration of justice, or tend to bring the court into disrespect, etc." *Ex parte Robertson*, 27 Tex.App. 628, 11 S.W. 669 (1889). "Generally speaking, he whose conduct tends to bring the authority and administration of the law into disrespect or disregard, interferes with or prejudices parties or their witnesses during a litigation, or otherwise tends to impede, embarrass, or obstruct the court in discharge of its duties is guilty of contempt." *Ex parte Norton*, 144 Tex. 445, 191 S.W.2d 713, 714 (Tex.1946), quoting 12 Amer.Jur., *Contempt*, § 2, p. 389. See also 13 Tex.Jur.3d, *Contempt*, § 3, p. 187.

While these notions are stated broadly, they can be broken into two specific acts: 1) an act which is disrespectful of the court and 2) an act which obstructs, or tends to obstruct, the proper administration of justice. In *Salfen*, supra, and *Jacobs*, supra, we noted the importance of the second type of act as a ground for contempt. However, this Court has never excluded disrespectful conduct from the common law, as a ground for contempt. With this in mind, we will

---

**6.** The only Texas statute relevant to direct criminal contempt provides:

"A court possesses inherently all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including the authority to issue such writs and orders as may be necessary or proper in aid of its jurisdiction. It has the duty to require that proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control proceedings that justice is done. A court has the power to punish for contempt." V.A.C.S., art. 1911a, § 1(a).

now determine whether refusing to rise when a judge enters a courtroom is conduct which can be found contemptuous under common law.

We can find no Texas case which deals with the question of whether refusal to rise when a judge enters the courtroom is contemptuous conduct. In the Federal judiciary, one federal circuit court has held that refusal to rise following a trial court's insistence that a contemnor comply with the "rising requirement is sufficiently related to maintaining order in the actual presence of the court that an infraction can be dealt with summarily...'" *In re Chase* 468 F.2d 128, 132 (7th Cir.1972), quoting *United States ex rel Robson v. Malone*, 412 F.2d 848, 850 (7th Cir.1969). Cf. *United States v. Snider*, 502 F.2d 645 (4th Cir.1974); *Com. v. Cameron*, 501 Pa. 572, 462 A.2d 649 (1983). Although distinguishable, see also *United States v. Abascal*, 509 F.2d 752 (9th Cir.1975); *Comstock v. United States*, 419 F.2d 1128 (9th Cir. 1969).

In *Chase*, supra, the defendant, along with ten co-defendants, was tried on numerous federal charges. At the start of the trial, the defendant refused to stand when the trial judge entered the courtroom. He continued to refuse to stand throughout the trial, despite repeated admonishments and warnings by the court. The trial court found defendant in contempt of court on 99 separate occasions. In upholding the contempt convictions, the circuit court stated:

"As we pointed out, 'the traditional rising in unison of persons present in a court can reasonably be thought to contribute to the functioning of the court. It is a way of marking the beginning and end of the session, and probably serves to remind all that attention must be concentrated upon the business before the court, the judge's control of the court room must be maintained with as little burden on him as possible, and there must be silence, except as the orderly conduct of business calls for speech.'" *Chase*, supra, at 132, quoting *Malone*, supra, at 848.

 It is important to note that *Chase*, supra, involved the more restrictive statutory contempt power of federal courts.[7] "Congress has limited the summary contempt power vested in [federal] courts to the least possible power adequate to prevent *actual obstruction of justice.*" *In re McConnell*, 370 U.S. 230, 235, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434 (1962). Contempt powers of Texas courts are not similarly restricted. Therefore, contemptuous conduct under federal law has only limited applicability in Texas.[8] Common law allows a conviction for contempt under the broader notion of disrespect as well as obstruction, or tendency to obstruct, the proper administration of justice.[9] Unlike federal law, our law has not required that an actual obstruction of justice be present.

 With these differences in contempt law in mind, we find the circuit court's opinion in *Chase*, supra, persuasive. A direct refusal to rise upon the judge's entrance interrupts the normal proceedings of the court, disregards the formality and ser-

---

**7.** The federal contempt statute relevant in *Chase*, supra at 132 n. 4, provides:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
 (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1).

**8.** This difference in federal and state law provides a critical distinction between our holding in the instant case and the holding in *Snider*, supra. The court in *Snider*, supra, reached the opposite conclusion of the court in *Chase*, su-

pra, but both were interpreting the same federal statute. Therefore, as the Justice Widener noted, "[s]ince [this court's ruling] is not based on federal constitutional grounds, it need have no effect upon the various States in the Circuit." *Snider*, supra at 665. The same reasoning applies for distinguishing *Cameron*, supra, because the Pennsylvania contempt statute mirrors the federal contempt statute.

**9.** Lacking any specific statute we will follow the common law of England provided it is not inconsistent with the Constitution or laws of this State. V.A.C.S., Art. 1.

iousness of a court's function, and directly conflicts with the "imperative need of the community in having an established forum in which controversies between man and man and citizen and sovereign may be decided in a calm, detached, neutral atmosphere." *Snider,* supra at 665 (Widener, J., dissenting). See also, *Cameron,* supra 462 A.2d at 652–653 (McDermott, J., dissenting). Therefore, we find that a refusal to rise after being admonished of the rising requirement constitutes an act of disrespect toward the court and an act which obstructs the proper administration of justice.

In the instant case, Judge Floyd found that applicants' refusal to rise was an act of disrespect toward the court. Judge Floyd confronted Krupps in chambers and admonished him that he was required to rise upon entrance of the judge into the court. Applicants ignored Judge Floyd's warning and intentionally refused to rise upon entrance of the judge into the court. These facts prove beyond a reasonable doubt Judge Floyd's conclusion that applicants were in contempt of court.

Applicants finally argue that the rising requirement unconstitutionally burdens their religious beliefs. They rely upon *West Virginia v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), for the argument that this Court should recognize a religious exception to the rising requirement. In *Barnette,* supra, the Supreme Court held that, in limited circumstances, a sincere religious belief can create an exception to the practice of saluting the flag.[10]

■ However, it is unnecessary for this Court to decide whether the First Amendment requires such an exception. Even if the rising requirement created a burden on applicants' religious freedom, Judge Floyd removed the burden by giving them the option of remaining outside until after court convened. Applicants mooted whatever First Amendment claim that he might

have had when they rejected that alternative. Any burden on their religious freedom at that point was self-imposed. Judge Floyd did not demand that they remain in the court and comply with the rising requirement. Instead, showing admirable restraint, Judge Floyd gave them a choice, and they decided to remain. Once applicants chose to remain and refused to rise, it became difficult to understand what religious tenet was being expressed.

Accordingly, the relief requested is denied.

McCORMICK and WHITE, JJ., concur in the result.

ONION, Presiding Judge, concurring.

This Court should not have, contrary to longstanding policy, granted leave to file this application for writ of habeas corpus seeking to invoke its original jurisdiction.

Of course the Court of Criminal Appeals has the power to issue the writ of habeas corpus, subject to such regulations as may be prescribed by law. Article V, § 5, Texas Constitution; Article 11.05, V.A.C.C.P. The Court has general and unlimited jurisdiction to issue original writs of habeas corpus in all cases, including those of a civil nature. *Ex parte Japan,* 36 Tex.Cr.R. 482, 38 S.W. 43 (App.1896); *Ex parte Norvell,* 528 S.W.2d 129 (Tex.Cr.App. 1975); *Ex parte Powell,* 558 S.W.2d 480 (Tex.Cr.App. 1977). "However, it is the policy of the court of criminal appeals not to entertain jurisdiction to grant original writs of habeas corpus, except in extraordinary cases ... the court of criminal appeals will not issue original writs of habeas corpus in cases where other courts have jurisdiction to do so. For example, the court of criminal appeals will not exercise its original habeas corpus jurisdiction in attacks on the validity of a misdemeanor conviction, since the county courts and district courts and judges thereof have jurisdiction to grant

---

**10.** We note that the court in *Chase,* supra, commented that "[t]he functional justification for the judge's entitlement to require rising, unlike, perhaps, the flag salute, is not something completely devoid of functional significance and solely designed to signify a certain set of beliefs."

such relief and an appeal lies from any such court's order denying relief." 38 Tex. Jur.3rd, Extraordinary Writs, § 62, pp. 124–126, and cases there cited.

In *Ex parte Fitzpatrick*, 167 Tex.Cr.R. 376, 320 S.W.2d 683 (App.1959), it was held that while the Court of Criminal Appeals has original jurisdiction to grant writs of habeas corpus it will do so only when relator has been unsuccessful in obtaining relief from trial court having similar jurisdiction.

This Court does not take testimony. *Ex parte Rodriguez*, 169 Tex.Cr.R. 367, 334 S.W.2d 294 (App.1960). All we have before this Court as to what happened in County Court at Law No. 3 of Jefferson County are "statements" of applicants attached to the pleadings and affidavits from the respondent judge, bailiff, etc., filed with the response requested by this Court. Upon these conflicting versions this Court tries, though badly divided, to write on the proper law applicable.

I would deny the application for writ of habeas corpus seeking to invoke involving our original jurisdiction without prejudice to the applicants seeking habeas corpus relief from a trial court where the witnesses can be subjected to examination, direct and cross, and the facts fully developed. If the applicants do not get the relief requested an appeal lies therefrom. The applicants have other remedies without this court of last resort getting involved in every case of contempt in every court in this state.

This Court should not abandon its long-standing policy of exercising its original habeas corpus jurisdiction with care in cases where other courts have habeas corpus jurisdiction and where the facts may be properly and fully developed before a decision on the law is made. And this is particularly true if the case is one of first impression in Texas as Judge Clinton states.

Apparently neither the majority nor the dissenters agree. Since the matter is go-

ing to be decided upon "statements"[1] and affidavits, then I would join the well written opinion of Judge W.C. Davis. From the meager evidence it is apparent the applicants came ready for confrontation. What occurred was contempt, direct contempt and nothing but direct contempt. In my opinion, to suggest the same was constructive contempt is absurd.

What Justice McDermott of the Pennsylvania Supreme Court wrote in his dissenting opinion in *Commonwealth v. Cameron*, 501 Pa. 572, 462 A.2d 649, 38 A.L.R.4th 555 (1983), is here pertinent.

"The rising in unison is not a token of respect for the person of the judge. For all, including the judge, stand. The ceremony is simply an admonition to put aside all other matters and direct and center attention to the business before the court. It separates the corridor from the courtroom, giving notice that the record is open and no distractions from the defendant's business can be allowed. Analyzed to its clearest purpose, it is the authority of the court being exercised in the interest of the concentration and attention to which the defendant's business is entitled. No one, including the defendant, should be allowed to alter or dilute that purpose.

"I have said that the refusal to stand when court is convened is both an abuse of process and an obstruction. It is an abuse of process because it allows a statement to be made to the court, jury, and other parties, before any statement is allowed by the rules. The statement may indeed be more forceful by action than words. It does not matter what is intended by the action. It may be threat, warning, or absurdity. Whatever is intended, it is out of order and, for whatever it is worth, it is done for an advantage that cannot be answered.

"Refusal to stand, or refusal to sit, is also an obstruction to orderly process, for it is intended, and does in fact, defeat the purpose of concentration and atten-

---

1. The applicants' statements as to what occurred are not sworn to by them. Each states he does

not take oaths. Most conclude "I will let my Yea be Yea and my Nea be Nea as is written."

tion by rendering the defendant's person the cynosure of all present, if only because he is out of order. When one is permitted to make statements by word or action, not permitted by the rules, all present lose their commitment to the need for quiet and order. Indeed, some are frightened. Not always an unintended side effect.

"The majority undertakes a careful analysis of the criminal contempt statute. They err, however, in concluding that conduct such as this does not obstruct the proceedings. It is an obstruction; of a silent, passive nature, doubtless, but a powerful, undeniable pernicious obstruction nonetheless."

I fully agree with Justice McDermott. When this writer commenced his judicial career almost 32 years ago, there was no formal commencement of a trial court session, no traditional rising in unison of persons present in a court. All that came a few years later in Texas. There can be no doubt that rising in unison of persons present contributes to the functioning of the court. It marks the beginning and ending of each session and serves to remind all that attention must be concerned upon the business before the court. The judge's control of the courtroom must be maintained with as little burden on him as possible. The rising requirement serves both substantive and procedural interests and constitutes an integral part of the judicial process. Persons do not rise in respect of the judge, a temporary office holder, but in respect of the governmental institution, the court.

Although I would deny the applications without prejudice as stated, I would concur in the action taken.

CLINTON, Judge, dissenting.

Since they are unique the problems in this cause may not be resolved routinely by trying to find the right light of classification of kind and nature of contempt to focus on the several scenarios that one or more applicants played out an afternoon and some again the following morning.

The notion seems to be that once the proper light is turned on given active and passive conduct, one will know he is seeing a particular type of contumacious conduct and then is enabled to critique it according to its narrow contextual classification and surrounding traditional trappings. Sometimes, however, a problem defies classification by label, and thus may not be resolved by rote. Of first impression in Texas, this cause surely presents just such an occasion.

At the threshold it is observed that although some applicants did not rise when respondent judge left the courtroom the first afternoon, that particular "act" is not in issue here, for the judge did not remotely suggest that any applicant was held in contempt for that behavior. Thus, we are not presented with the bare question of whether just an "act" of not rising when a bailiff intones "all rise" is in itself "an affront to the dignity of the court or disruptive conduct in the courtroom," *Ex parte Gordon*, 584 S.W.2d, 686, 688 (Tex. 1979).

Here, however, the initial failure to rise triggered what followed, commencing with a prompt admonition from the bailiff, response of some applicants and the bailiff's reporting those developments to respondent judge. Thus the stage was set for the players, but a script had not yet been written. And from the record before this Court we are unable to identify all the players, to determine their respective role or how each played his own. There are serious factual conflicts and some sensitive matters lurking about in this particular cause—not the least of which is an asserted religious belief.

Nevertheless, unless performing an act of respect to the court is to be at will of every person in the courtroom according to his own lights, this Court must require of applicants that which we demand in our own courtroom or recognize a justification for not rising the next morning.

Since the statutes do not define contempt of court, except in certain instances, Texas courts are relegated to the common law in

determining meaning, scope and extent of the doctrine, in the light of our constitutional safeguards and the spirit and genius of our institutions. As pertinent here, one is guilty of contempt when one's conduct is an affront to the dignity of the court or is disruptive in the courtroom, *Ex parte Gordon,* supra; *Ex parte Landry,* 65 Tex.Cr.R. 440, 144 S.W. 962 (1912); *Ex parte Wolters,* 64 Tex.Cr.R. 238, 144 S.W. 531 (1911), or "tends to bring the authority and administration of the law into disrespect or disregard ... or to impede, embarrass, or obstruct the court in the discharge of its duties." 13 Tex.Jur.3rd 182, Contempt § 1; *Ex parte Norton,* 144 Tex. 445, 191 S.W.2d 713, 714 (1946).

Article 1911a, V.A.C.S., provides that a court "has the duty to require that proceedings shall be conducted with dignity ..." Under a statute granting power to punish for contempt "misbehavior [that] obstruct[s] the administration of justice," Federal courts have found that because "the traditional rising in unison of persons present in a court can reasonably be thought to contribute to the functioning of the court ..., the court may require such rising, in the interest of facilitating its functions" and, therefore, may enforce that requirement—though against a claim of religious freedom vouchsafed by the First Amendment they lack unanimity. *United States ex rel. Robson v. Malone,* 412 F.2d 848, 850 (CA7 1969); *In re Chase,* 468 F.2d 128, 133 (CA7 1972); see *United States v. Seale,* 461 F.2d 345, 371 (CA7 1972) and *Comstock v. United States,* 419 F.2d 1128 (CA9 1969). Contra: *United States v. Snider,* 502 F.2d 645, 657–660 (CA4 1974); see also *In re Dellinger,* 461 F.2d 389, 401 (CA7 1972).

Pointing out that acts of applicants occurred in the presence of the court, respondent judge argues from *Ex parte Norton,* 610 S.W.2d 512, 513 (Tex.Cr.App. 1981) and *Ex parte Supercinski,* 561 S.W.2d 482, 483 (Tex.Cr.App. 1977), that he was empowered summarily and without a hearing to hold applicants in contempt. The rationale is that since the court sees or hears actual misbehavior in the courtroom the judge "knows of all the facts which constitute the contempt," *Supercinski,* supra; *Ex parte Ratliff,* 117 Tex. 325, 3 S.W.2d 406 (1928).

Although in his brief respondent judge insists that "in the direct contempt proceedings before [him], no such consitutional rights were asserted," p. 7, "in a reasonable and intelligent manner," p. 9, the majority has found otherwise; it says that he "offered applicants, through Krupp, the alternative of remaining outside the courtroom until court had convened." But Judge Campbell correctly points out, "The record is silent as to whether Krupps conveyed any message from the judge to any of the other six applicants."

Ordinarily purpose or intent is irrelevant in determining whether an offensive act is contemptuous; the nature of the act itself is determinative. 13 Tex.Jur.3rd 182, Contempt § 1. The judge may convict and punish summarily on his own personal knowledge and observations taking into consideration "all the circumstances of aggravation, provocation, or mitigation," 13 Tex.Jur.3rd 248, Contempt § 50. However, where—as the majority has found here—a judge is aware that an alleged contemnor claims his quiet and peaceful behavior is protected by the First Amendment or Article I, § 6 of our Bill of Rights, the court does *not* "know of all the facts." Requisites of due process and due course of law dictate a hearing be held to determine whether that claim is founded on a sincerely held religious belief, and to what extent it may excuse otherwise contemptuous behavior or mitigate against punishment. See *United States v. Snider,* supra, 502 F.2d at 657–658.[1]

---

1. Holding such a hearing might then present "a very serious constitutional question ... not unlike that in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)," viz:

"It is not easy to distinguish the rising requirement from the flag salute. Both seem to require affirmation, if not a belief, at least of 'an attitude of mind.' 319 U.S. at 633, 63 S.Ct. [at 1183]."

Accordingly, I would vacate the commitment orders without prejudice to respondent's holding a proper hearing should he be advised to pursue the matter of contempt.

TEAGUE, Judge, dissenting.

I first point out that this is not an active disorderly trial or courtroom case, as the majority opinion implicitly tries to make it out to be. It is instead a passive disrespectful courtroom case in which several persons refused to adhere to the ancient, traditional, ceremonial, or symbolic act of persons in a courtroom rising or standing in unison upon command of the court bailiff at the commencement of the court session. I further point out that my research reflects that dignity and decorum in a courtroom are not achieved, nor do they turn on, whether a defendant, a spectator, or a witness refuses to stand or rise or does not refuse to rise or stand in a courtroom when commanded to do so. Given the facts and circumstances of this cause, there is, very simply, insufficient reason to invoke in this cause the awesome power of direct contempt to cope with the petty form of disrespect that the applicants exhibited in the trial court. See Dorsen and Friedman, *Disorder in the Courtroom: Report of the Association of the Bar of the City of New York, Special Committee on Courtroom Conduct* (Pantheon Books, 1973 edition), at page 113.

Concerning the applicants' refusal to rise or stand, I am in agreement with the approach that the Justice of the Peace in this cause took when the applicant Krupps' criminal case, *for operating a motor vehicle without liability insurance,* was pending in that court. I believe, as the record reflects or indicates that the Justice of the Peace apparently believed, that this kind of problem is best handled much in the same way as you deal with young children. There are just a lot of things you don't see. In that kind of situation, I believe that it is

just better that one not see it. It is obvious to me that the applicants in this cause, for whatever reason, are seeking attention, much like a young child craves attention. Given the facts and circumstances of this cause, I, for one, would not give the applicants the attention they seek, by putting this Court's seal of approval on their contempt convictions—let them go elsewhere, if they can, to get their attention.

Those who join the majority opinion, however, do not subscribe to my kind of thinking, but trudge onward and try to give legal reasons why the applicants' convictions for direct contempt of court must be sustained. The majority opinion totally fails to justify sustaining the contempt orders of the trial court. Therefore, I must, like Judge Campbell has done, see the dissenting opinion that he has filed in this cause, because the majority opinion presents such an inviting target, dust off my hunting license and don one of those marvelous British safari hats for the occasion, and a hunting I shall go.

Because of one of the issues in this cause, Ben Milam of Texas history fame's declaration that "Texans do not stand for any man, but only for their God" is applicable to this cause. What Henry Thoreau declared in *A Week on the Concord and Merrimack Rivers,* which I have carefully reworded to fit this cause, "All men are partially buried in the grave of custom, and of some we see only the crown of their heads and the robes that they wear," may also be applicable to this cause.

The record reflects that Charles Edward Krupps and six other persons were held in direct contempt of court by Hon. Donald J. Floyd, the duly elected judge of County Court at Law No. 3 of Jefferson County, *only* because they did not rise or stand when ordered to do so after Judge Floyd entered his courtroom on the day in question. Judge Floyd assessed punishment

---

*Snider,* supra, at 660. That the majority may find it "difficult to understand what religious tenet was being expressed" when applicants "chose to remain and refused to rise" will not

justify a denial of due process and due course of law by refusing each an opportunity to explain "an attitude of mind," *Ibid.*

for each person at 30 days' confinement in the Jefferson County Jail. The majority opinion affirms the orders of contempt. I respectfully dissent to such decision.

In dissenting, I first point out that there is not a scintilla of evidence in the record before us that would indicate or reflect that the applicants' act of not rising or standing was accompanied by any disorder, disturbance, or interruption of the court's business. At no time did any of the applicants ever speak maliciously, antagonistically, or belligerently either to Judge Floyd or his bailiff, or anyone else for that matter, either inside or outside of the courtroom. Notwithstanding these facts, a majority of this Court sustains Judge Floyd's orders of contempt. I suppose it does so on the feeble reasoning that not to uphold Judge Floyd's orders would somehow destroy order in all of our courtrooms, which argument I find closely resembles the one that if a trial judge does not wear a robe when he is on the bench he will not get the respect and attention of those in attendance, and chaos will then reign in our courtrooms. And Judge Pete, we all know that the latter is a bunch of poppeycock, don't we?

I believe that if one will carefully give the ancient subject of rising and standing in the courtroom, which my research has yet to reveal its real source, a little thought, he will conclude, as I have done, that the ancient, traditional, ceremonial, or symbolic act of persons in a courtroom rising or standing in unison upon command of the court bailiff, or some other person who is directed by the judge to give the command, is not necessary to the carrying out of the court's business in an orderly fashion.[1]

The usual reasons given why persons must rise or stand after a trial judge or an appellate court judge enters his courtroom are the following: It is a way of marking the beginning of the court's session; it probably serves to remind all that attention must be concentrated upon the business before the court; it reminds those present that the judge's control of the courtroom must be maintained at all times with as little burden on the judge as possible; and it probably instructs all persons present that there must be silence, except as the orderly conduct of business calls for speech. See *U.S. ex rel. Robson v. Malone*, 412 F.2d 848, 850 (7th Cir.1969). If there was no other way than to require those in the courtroom to rise or stand in unison upon command in order to accomplish the court's orderly conduct of its business, I might agree with the majority opinion. However, there is another and very simple way to accomplish the above objectives.

If the per se act of refusing to stand or rise in a courtroom actually obstructs or tends to obstruct the proper administration of justice, constitutes disrespect for the court, or its process, interrupts the normal proceedings of the court, causes the formality and seriousness of the court's business to be disregarded, and directly conflicts with the "imperative need of the community in having an established forum in which controversies between man and man and citizen and sovereign may be decided in a calm, detached, neutral atmosphere," as the majority claims, I must ask the author of the majority opinion, and those who join his opinion, whether they have actually ever been in a courtroom filled with persons, where the bailiff declares in a rather loud voice, "All rise," with the trial judge then ascending the bench, and thereafter

[1]. In the concurring opinion that Presiding Judge Onion has filed in this cause, he states that "When this writer commenced his judicial career almost 32 years ago, there was no formal commencement of a trial court session, no traditional rising in unison of persons present in court. All that came later in Texas." If rising or standing in unison of persons in a courtroom is so extremely important to preserve our court

system, then I must ask the following questions: In the preceding 118 years, how on earth did our courts manage to function without persons in the courtroom not rising or standing upon command? Does this mean that from 1836 until 1954, for 118 years, we were a civilized society, and not a barbaric society which the majority opinion implies that we are today?

the courtroom sounding much like a stampeding herd of cattle? And, after the bailiff declares in another rather loud voice, "All please sit," the courtroom's sound repeats itself? Having witnessed such sights many times in my legal career, in both rural and urban courtrooms, I must state that if the per se act of failing to rise or stand upon command constitutes an obstruction of the proper administration of justice, the rising or standing in unison by persons in the courtroom, upon the command of the bailiff or some other authorized person, equally constitutes an obstruction of the proper administration of justice. The majority opinion's dog might have been a good hunting dog many years ago, but I find that today, if one carefully examines him, he will easily find that the dog has gotten too old and will no longer hunt as he once did.

If one also places the majority opinion under the microscope, in order to find valid reasons that might justify its holding that the applicants are guilty of direct or criminal contempt of court, he will not find any valid reasons therein why the mere act of the applicants refusal to stand or rise "interrupted the normal proceedings of the formality and seriousness of the court's function"; or that their mere act of not standing or rising "directly conflicted with the imperative need of the community in having an established forum in which controversies between man and man and citizen and sovereign may be decided in a calm, detached, neutral atmosphere."

The majority opinion also makes the ludicrous statement that if the rising or standing requirement that was imposed in this cause created a burden on Krupps' religious beliefs, that burden was removed when Judge Floyd gave him the option of remaining outside the courtroom until after court convened. Would this Court hold that a state statute which authorizes a minute "for meditation or voluntary prayer" in public schools would be a valid statute provided that the statute also contained a provision that those persons who did not wish or desire to participate were given the option of leaving the classroom? Cf. *Wallace v. Jaffree*, —— U.S. ——, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). Would this Court uphold a law that made it mandatory that a person in attendance at a public school must salute the American flag if the statute also contained a provision that those persons who did not wish or desire to salute the flag were given the option of leaving? Cf. *West Virginia v. Barnett*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). I do not believe that even the present United States Supreme Court would sustain these kinds of state statutes.

In holding that if the rising or standing requirement created a burden on the religious beliefs and freedoms of the applicant Krupps, because he was a party litigant in court that day, the majority opinion overlooks the fact that the Constitutional right to a public trial does not mean one in which a party litigant is permitted to be present in the courtroom part of the time, but not all of the time, as the majority opinion implicitly holds; he is entitled to be present all of the time—provided he behaves himself. Cf. *Allen v. Illinois*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Also see Antieau, Vol. 1, *Modern Constitutional Law*, Section 5:57. I emphasize the fact there is not a scintilla of evidence that the applicant Krupps ever misbehaved when he was in Judge Floyd's courtroom.

Furthermore, the record is totally absent of any evidence that any applicant made or attempted to make Judge Floyd's courtroom a forum or circus in order to make their religious beliefs known, or to solicit converts, nor is there any evidence that any applicant ever caused any actual interruption, interference, or obstruction of the judicial process or the operation of Judge Floyd's courtroom.

Trial judges do not have the untrammeled discretion to punish every act that they might find to be personally offensive as a criminal contempt. Furthermore, summary contempt procedure is to be invoked and applied only as a last resort. *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); *In re Oliver*,

333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *United States v. Flynt*, 756 F.2d 1352 (9th Cir.1985); *In re Gustafson*, 650 F.2d 1017 (9th Cir.1981); *Ex parte Elmore*, 161 Tex. 585, 342 S.W.2d 558 (Tex.Sup.Ct. 1961).

The use of the summary contempt power by a trial judge must be consistent with the reasons for criminal or direct contempt, and the bare fact that an individual's behavior might be offensive to a particular trial judge's personal sensibilities does not necessarily render it contumacious behavior. See *Brown v. United States*, 356 U.S. 148, 153, 78 S.Ct. 622, 625, 2 L.Ed.2d 589 (1958).

I return to the question that Judge Campbell in the dissenting opinion that he has filed in this cause partly answers as to the applicants except Krupps, whether the applicants' conduct in intentionally or knowingly failing or refusing to rise or stand when Judge Floyd entered his courtroom is sufficient *without more* to sustain a direct or criminal contempt conviction?

Notwithstanding my views toward the ancient, traditional, ceremonial, or symbolic act of persons in a courtroom rising or standing in unison upon command of the court bailiff, or some other authorized person, at the commencement of the court session, before the power of summary contempt may be invoked and applied it is universally held that the conduct *must* interfere with and disrupt the orderly process of a court before it will constitute direct contempt.

The majority opinion states that it finds the Federal Seventh Circuit Court of Appeals' opinion of *In re Chase*, 468 F.2d 128 (7th Cir.1972), "persuasive." Although a number of federal courts have determined that under the federal statutory counterpart to our contempt statute, the rising or standing requirement may be enforced with criminal contempt, they also hold that *this kind of contempt power may be exercised only when the failure or refusal to rise or stand is accompanied by a disruption of the proceedings.* See, for example, *United States v. Wilson*, 421 U.S. 309, 95

S.Ct. 1802, 44 L.Ed.2d 186 (1975); *United States v. Flynt*, 756 F.2d 1352 (9th Cir. 1985); *In re Chase*, supra; *United States v. Abascal*, 509 F.2d 752 (9th Cir.1975), cert. denied 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975); *In re Dellinger*, 461 F.2d 389 (7th Cir.1972); *United States ex rel Robson v. Malone*, 412 F.2d 848 (7th Cir.1969); *Comstock v. United States*, 419 F.2d 1128 (9th Cir.1969). Also see *Commonwealth v. Reid*, 494 Pa. 201, 431 A.2d 218 (1981).

In finding that *In re Chase*, supra, is "persuasive" authority to sustain the contempt convictions of the applicants, the majority opinion overlooks the fact that the Seventh Circuit in *Chase*, supra, rejected out of hand the government's argument that the failure to rise or stand *in itself* created a per se obstruction of judicial administration punishable by criminal contempt. In affirming the defendant's contempt conviction, the *Chase* court found it significant that the deputy marshal had to assist the defendant Chase to his feet and that the trial was interrupted at least four times in order for the judge to read the contempt citations. *It was these interruptions, and not the mere refusal to rise or stand, that were found to constitute an "actual, material obstruction" contemplated by the federal contempt statute.* The *Chase* court was also careful to point out that the failure or refusal to rise or stand in the courtroom may amount to an actual and material obstruction of judicial administration *if* it distracts others in the courtroom or provokes a reaction on the part of others in the courtroom or is accompanied by a failure to become silent or focus attention on the business before the court. *In re Chase*, supra, 468 F.2d at 133.

In our cause, there is not any evidence that might warrant the inference that the act of the applicants not rising or standing provoked a reaction on the part of those other persons who were then in the courtroom or that the applicants were noisy or boisterous when they did not choose to rise or stand after Judge Floyd entered his courtroom on the day in question.

Just recently, the Supreme Court of Pennsylvania, in *Commonwealth v. Cameron*, 501 Pa. 572, 462 A.2d 649 (Pa.Sup.Ct. 1983), also see 38 *A.L.R.4th* 555, answered the question whether a defendant's refusal to rise or stand, *without more*, is sufficient to sustain a direct contempt conviction in the negative. The Pennsylvania Supreme Court held that although the rising or standing requirement may constitute "misbehavior in the presence of the court," it is the resulting obstruction of the proceedings that is critical to sustaining a criminal contempt citation.

The annotation in 38 *A.L.R.4th* 563, entitled "Failure to rise in state courtroom as constituting criminal contempt," points out that "The relatively few state cases considering the propriety of punishing any person for failing or refusing to stand in a courtroom when required to do so appear to indicate that such misconduct, *standing alone*, is not sufficient to justify a citation for criminal contempt, and that there must be some active disruption of court proceedings before such a penalty may be imposed." (564). (My emphasis.) I pause to state the following: Just last week, see *Chambers v. State*, 711 S.W.2d 240 (Tex. Cr.App.1986), an aggressive and assertive majority of this Court found an *A.L.R.* annotation "persuasive" as authority to support its holding that unobjected to hearsay has probative value in judging the sufficiency of the evidence. However, this week it does not even acknowledge that work. What's going on here? If that work was authoritative last week, should it not also be authoritative this week? Or, is the reason the author of the majority opinion ignores it this week because what is stated therein is not to his and those judges who join his opinion's likings?

If one carefully analyzes the majority opinion, I believe that he or she will conclude, as I have done, that the bottom line in the opinion represents nothing less than the fact that the author of the majority opinion, and those members of this Court who join his opinion, believe that the applicants were discourteous to the trial judge

in this cause by refusing to rise or stand after he entered his courtroom on the day in question, and that such was both an abuse of process and an obstruction of the administration of justice, and because of this they should be summarily punished for such act, which is, in the view of those who vote for the majority opinion, an act that is apparently "honored only by civilized and sensible men." In short, they believe that without this ancient, traditional, ceremonial, or symbolic act, chaos would reign in our courtrooms. If there was no other way to mark the beginning of the court's session; if there was no other way to remind all that attention must be concentrated upon the business before the court; if there was no other way to remind all that the judge's control of the courtroom must be maintained with as little burden on the judge as possible; and if there was no other way to impress upon persons in the courtroom that at all times there must be silence, except as the orderly conduct of business calls for speech, I might agree with the majority opinion. However, if one subscribes to the agency theory, as the majority opinion apparently does, see the dissenting opinion filed by Judge Campbell in this cause, why cannot the above be reduced to writing and have the agent, whoever that might be, such as the bailiff, court reporter, clerk, court coordinator, probation officer, prosecuting attorney, defense attorney, or perhaps all doing it in unison, utter these admonitions loudly to those in attendance in the courtroom? If this is done, and after the trial or appellate court judge takes his bench, a member of the audience violates one or more of the admonitions, and that person is held in direct or criminal contempt of court, then the majority opinion might make a little sense. However, given the facts and circumstances of this cause, it presently makes no sense at all.

Because the majority opinion erroneously holds that a person's mere refusal to rise or stand upon command after the trial judge enters his courtroom, *without more*, is sufficient to sustain a direct criminal

contempt conviction, I am compelled to respectfully dissent. I believe that opinions like this one do not cause our trial courts to gain respect from our citizenry, but, to the contrary, such opinions can actually breed disrespect for our courtrooms and our trial judges, and cause disturbances where before there were none.

CAMPBELL, Judge, dissenting.

This writer derives no particular pleasure from engaging in the "sport" of dissent writing, but the majority opinion in the instant case presents such an inviting target that I felt compelled to dust off my hunting license and don one of those marvelous British safari hats for the occasion.

I begin this sojourn by stating that I am in complete agreement that "the traditional rising in unison of persons present in a court can reasonably be thought to contribute to the functioning of the court," and that "it is a way of marking the beginning and end of the session and probably serves to remind all that attention must be concentrated upon the business before that court, the judges control of the courtroom must be maintained with as little burden on him as possible, and there must be silence, except as the orderly conduct of business calls for speech." *In re Chase*, 468 F.2d 128, 132 (7th Cir.1972), quoting from *United States ex rel Robson v. Malone*, 412 F.2d 848 (7th Cir.1969).

But the majority opinion with both its writing and research style strikingly, nay hauntingly, deja vu, elevates the "failure to rise in unison requirement" to per se contumacious conduct, and ultimately, direct contempt. This conclusion defies the dearth of case law in this area, and in doing perhaps the most mischief, defies one of those fundamental tenets of a free society which

separates us from other mammals—the due process of law.

### I. *The Conduct*
#### A. *Applicant Krupps*

I am in agreement with the majority's disposition of the conduct of applicant, Krupps.[1] Judge Floyd confronted Krupps in chambers and admonished *him* to rise when the judge entered the courtroom. Krupps, in defiance of this direct order from the judge, then intentionally refused to rise when the judge entered the courtroom. According to the federal case law cited in the majority opinion, this is clearly direct, contumacious conduct which is summarily punishable, because it was "personally observed by the judge" (*In re Oliver*, 333 U.S. 257, 275–276, 68 S.Ct. 499, 509, 92 L.Ed. 682) *after the judge had personally confronted and admonished Krupps.*[2]

#### B. *The Six Other "contemptuous" Applicants*

The majority opinion begins to unravel like a bad suit of clothes, when it postulates that court personnel, such as bailiffs, and implicitly, one imagines, court reporters, clerks, docket coordinators, probation officers, prosecutors, etc., may, through some sort of agency theory, observe contumacious conduct, report said conduct to the unsuspecting judge, thereby magically transforming constructive contempt into direct contempt, all in the name of and by the authority of being "officers of the court."

Judge Floyd stated in the documents of commitment that the applicants were held in contempt for "being disrespectful by failing to rise upon the entrance of the Court after being duly admonished and warned of consequences of their failure to do so."[3] But the gravamen of contempt

---

**1.** The punishment that Krupps received will be discussed, infra.

**2.** All emphasis is supplied throughout by the author of this opinion unless otherwise indicated.

**3.** The trial court did not deliver this warning in person. Nor was he present when the bailiff

delivered this warning. In his affidavit before this Court, respondent Judge Floyd stated:

> "*I advised Deputy Collins to inform Mr. [the applicants]* that if they continued to show disrespect for the Court by not standing when Court convenes, I would hold them in contempt; and place them in jail for 30 days. *Deputy Collins returned to the courtroom to inform the [the applicants] of my decision.*

contains two elements which the judge must have personally observed to have found direct contempt: 1) an admonishment and warning of the consequences of failing to rise and 2) a failure to rise. I now examine the record to determine whether Judge Floyd was present and personally observed both elements for the six applicants.

Judge Floyd clearly observed the second element when he personally observed all of the applicants fail to rise on June 14, 1985. However, the record reflects that six of the applicants (H. Eddington, H. Matthews, V. Rose, L. Rose, R. Henley and J. Henley) did not receive an admonishment and warning of the consequences of failing to rise in the presence or hearing of Judge Floyd. See n. 3, infra. At no time was Judge Floyd present when these applicants were admonished and warned of the consequences of failing to rise.

The circumstances surrounding the direct contempt conviction of the six applicants who were not given an admonishment and warning in the presence of Judge Floyd are analogous to the circumstances in *Johnson v. Mississippi*, 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971). See also *Ex parte Ratliff*, 117 Tex. 325, 3 S.W.2d 406 (1928). In *Johnson*, supra, the Supreme Court reversed a contempt judgment because of due process violations. In addition to the trial court's failure to take immediate sentencing action, the Court noted:

> "Moreover, from this record we cannot be sure that Judge Perry was personally aware of the contemptuous action when it occurred. The State's version of what happened is described as follows in its motion that petitioner show cause why he should not be punished for contempt:
>
> > '[T]he Sheriff and Deputy Sherrif Hayward seized Robert Johnson and immediately carried him before the Circuit

Judge, Marshall Perry, and *related to the Judge what had transpired.* (Italics added)' [emphasis in original]

As we said in *In re Oliver*, 333 U.S. 257, 275–276, 68 S.Ct. 499, 509, 92 L.Ed. 682,

> 'If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements, due process requires . . . that the accused be accorded notice and a fair hearing. . . .' " Id., 91 S.Ct. at 1780.

Judge Floyd, by relying upon information received from his bailiff for his knowledge of the contemptuous conduct of six of the applicants, did not personally observe all of the elements of the contempt. Therefore, the contempt was in the nature of a constructive contempt. I believe that six of the applicants (H. Edgington, H. Matthews, V. Rose, L. Rose, R. Henley and J. Henley) should have been accorded the due process required in a constructive contempt adjudication.

#### C. The Logical Import of Today's Majority Holding

Significantly, Krupps was at least given the opportunity to express to Judge Floyd his reason for not rising in the courtroom. Krupps replied obliquely that he was a "follower of Christ." The judge requested that Krupps elaborate, and implied that something could be worked out by allowing Krupps to remain outside the courtroom when the Judge entered. Krupps declined and, in fact, expressed his intent to defy the judge again, which he subsequently did.

What of the other six applicants? The majority says that the judge, *through Krupps*, offered them the same alternative that had been offered to Krupps. Does this make Krupps an "officer of the

---

Again, they informed Deputy Collins they would not stand. *Deputy Collins advised me of their decision* and I decided to let them 'sleep on it' without further discussion once we had recessed until 9:00 am on June, 1985. ". . . [the next morning,] *Deputy Collins advised them* that the Court would hold them in

contempt and sentence them to 30 days in jail if they refused to stand when the Judge entered the courtroom. . . .
*"Deputy Collins advised the Court* again that they would not stand."

court?" The record is silent as to whether Krupps conveyed any message from the judge to any of the other six applicants. But even if the record affirmatively showed that Krupps did convey such a message, would the failure of the six applicants to rise in unison then constitute contempt of Judge Floyd, or would it constitute contempt of Krupps as an "officer of the court"?

The majority opinion simply cannot square its reasoning or holding with any sense of due process. The six applicants other than Krupps were given no admonishment, no alternative, and no explanation by the *judge* of the court. To favor them with the same summary treatment as Krupps is tantamount to standing the law of contempt on its bruised and battered ear. The logical conclusion to be drawn from the majority opinion is that the failure of spectators to rise in unison in a courtroom when a judge enters same constitutes direct contempt, punishable summarily without a hearing. To the physically handicapped—the deaf person, the paraplegic, and to those persons who have little or no command of the English language, I can only advise—avoid Texas courtrooms.

## II. *Was the length of the punishment given to Applicant Krupps an abuse of discretion?*

The Legislature has restricted the sentencing power of Texas courts in contempt cases by limiting punishment to a fine of not more than $500, or not more than six months confinement in county jail, or both. V.A.C.S., art. 1911a, § 2(a). However, where the use of direct contempt is involved, the Supreme Court has held:

> "Appellate courts have here a special responsibility for determining that the power is not abused, to be exercised if necessary by revising themselves the sentences imposed. This Court has in

past cases taken pains to emphasize its concern with the use to which the sentencing power has occasionally been put, both by remanding for reconsideration of contempt sentences in light of factors it deemed important, and by itself modifying such sentences. [citations omitted] The answer to those who see in the contempt power a potential instrument of oppression lies in assurance of its careful use and supervision, not in imposition of artificial limitation on the power." *Green v. United States*, 356 U.S. 165, 188, 78 S.Ct. 632, 645 (1958).

This Court has broad powers to entertain original writs of habeas corpus. Art. V, § 5, Tex. Const.; *Ex parte Davis*, 171 Tex. Cr.R. 629, 353 S.W.2d 29, 32 (App.1962). I believe that the careful review by this Court of claims of excessive direct contempt sentences falls within that broad power.[4] Such supervision in contempt cases is no less compelling than the constant review that we give to claims of excessive bail. See *Ex parte Davila*, 623 S.W.2d 408 (Tex.Cr.App.1981); *Ex parte Rubac*, 611 S.W.2d 848 (Tex.Cr.App.1981).

The Supreme Court has used several factors to determine whether a contempt sentence is appropriately within the discretion of a trial judge. Persistency of the defendant in repeating the contumacious conduct is an important consideration. *Yates v. United States*, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957). "Moreover, the court should consider '... the extent of the willful and deliberate defiance of the court's order [and], the seriousness of the consequences of the contumacious behavior....'" Id., 78 S.Ct. at 134, quoting *United States v. United Mine Workers*, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

Examining Krupps' conduct in view of the criteria set forth in *Yates*, supra, I

---

**4.** While it is true that the Legislature has limited the broad sentencing power of trial courts through Article 1911a, supra, there are no standards for determining when a sentence, though within the statutory range, would be considered excessive. In addition, there is no direct appeal from a contempt conviction. *Jacobs*, supra.

Therefore, in reviewing direct contempt sentences, we should adopt the criteria set forth in *Yates*, [infra.] Without these criteria, a trial court could sentence a contemnor to six months in jail and a $500 fine and avoid review, no matter how insignificant the contemptuous conduct.

believe that a sentence of thirty days is disproportionate to the persistency, willfulness and seriousness of the conduct and is therefore excessive, and I would remand to the trial court for reassessment of a punishment that fits the conduct.[5]

MILLER, J., joins.

MILLER, Judge, dissenting.

I join Judge Campbell's dissent and further disagree with the majority opinion's handling of appellant's final argument by stating:

"Even if the rising requirement created a burden on applicants' religious freedom, Judge Floyd removed the burden by giving them the option of remaining outside until after court convened."

At 151. I would reach the merits of applicant Krupps' complaint about burdening his religious freedom and, under these facts, decide against him.

It occurs to me that the majority's reasoning concerning alternative choice as a substitute for the exercise of a constitutional right suffers from the same flaw as "separate but equal" thinking or providing that certain people can ride the bus but only if they sit in the back (I'm not going to even mention the "moment of silence" as an alternative to school prayer controversy). Granted, we are talking about the balance of least intrusive means of infringing on a constitutional right in favor of courtroom decorum and the relationship of that balance to the concept of direct contempt, not just the right to exercise the constitutional right. Still the two are so intertwined that the mere fact that an alternative was given in this case does not justify the majority's cursory dismissal of applicant's claim that the balance of right

versus decorum should be tipped in his favor.

I dissent.

---

**5.** Courts have reduced contempt sentences that resulted from a defendant's refusal to rise upon the judge's entrance on a number of occasions. In *Malone,* supra, the court reduced a 30 day sentence to four hours and a 15 day sentence to two and a half hours. In *United States v. Abascal,* 509 F.2d 752 (9th Cir.1975), the court reduced a 90 day sentence to two weeks, though the conduct there included more than the mere refusal to rise. In *Comstock v. United States,* 419 F.2d 1128 (9th Cir.1969), the court affirmed a sentence of 15 days in jail, but the conduct included more than the refusal to rise. In *Chase,* supra, the court reduced a ten month sentence to 30 days, though the defendant had refused to rise 99 separate times.